**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**John A. RAPANOS, Defendant–Appellee.**

No. 95–2169.

United States Court of Appeals,
Sixth Circuit.

Argued March 21, 1997.

Decided May 28, 1997.

Jennifer J. Peregord, (argued and briefed), Office of the U.S. Attorney, Detroit, MI, for Plaintiff–Appellant.

John L. Wildeboer, (argued and briefed), David R. Skinner, Skinner & Wildeboer, Bay City, MI, for Defendant–Appellee.

Before: LIVELY, NELSON, and MOORE, Circuit Judges.

LIVELY, J., delivered the opinion of the court, in which MOORE, J., joined. DAVID A. NELSON, J. (pp. 375–78), delivered a separate dissenting opinion.

## OPINION

LIVELY, Circuit Judge.

This appeal requires us to consider the "open fields" doctrine in an unusual setting. After two trials, the first ending in a mistrial, a jury found the defendant, John A. Rapanos, guilty of two counts of discharging pollutants into wetlands in violation of 33 U.S.C. § 1311(a) (1988). In response to the defendant's post-trial motion for acquittal or for a new trial, the district court granted a new trial upon concluding that it had made a reversible evidentiary ruling. Defense counsel had not objected to admission of the testimony that the court determined had been erroneously received, but the court found that it had committed plain error. The government appeals, and we now reverse.

## I.

The defendant, John A. Rapanos, owns a large amount of real estate in Michigan, including the 175 acre parcel of land in Williams Township that is the subject of the present controversy (Salzburg Road Property). In 1988, Mr. Rapanos negotiated an option agreement with a developer that contemplated the construction of a shopping mall on the Salzburg Road Property. To make the property more attractive to the optionee, the defendant then spent over $300,000 in late–1988 and 1989 in order to clear the heavily-wooded property of trees and shrubs and to eradicate wetlands by filling them with sand.

On December 2, 1988, the defendant's attorney provided the Michigan Department of Natural Resources (DNR) with an outline of the defendant's plan for development and a survey of the property. The DNR responded by notifying Mr. Rapanos that the property appeared to contain wetlands and that, if this were true, a permit would be required before development could begin. As a follow-up to this correspondence, two DNR officials toured the property with the defendant and his attorney on March 1, 1989. The DNR inspectors determined that the property did in fact contain some wetlands and observed that "[t]he vegetation on much of the site had been scalped, removed by using either a bulldozer, or some other type of heavy equipment. . . ." At the conclusion of the meeting, the DNR officials reiterated that a state permit would be required before any development could take place and informed Mr. Rapanos that he would have to obtain a "wetlands delineation" (a map showing the boundaries of wetlands areas on a parcel of land) before receiving that permit.

The defendant quickly hired a wetlands consultant, Dr. Glenn Goff, to prepare the wetlands delineation, telling him, according to Dr. Goff, to "get [the DNR] off my back." Over a period of several weeks Dr. Goff gathered information pertaining to the property, including soil and plant samples, on which he would base his delineation. When Dr. Goff reported his preliminary finding that the property contained nearly 50 acres of wetlands, however, Mr. Rapanos discharged him and allegedly ordered Dr. Goff to destroy his study materials and preliminary report. Dr. Goff testified that the defendant was enraged and exclaimed that

"he'd destroy all those (expletive deleted) wetlands."

After firing Dr. Goff, the defendant continued to prepare the property for development. Charles Dodgers, an employee in the DNR's Land and Water Management Division, periodically visited the property during the spring and summer of 1989 and witnessed this preparation, which the government characterizes as "systematic wetlands destruction." On July 24, 1989, the DNR directed Mr. Rapanos to "cease further filling activities immediately, and to contact [the DNR] regarding your intent for this wetland parcel." When the defendant ignored this cease and desist order, the DNR eventually held two meetings with Mr. Rapanos to discuss the status of the property.

The first meeting occurred on August 22, 1989, when five DNR officials met the defendant at the boundary of his property. Although their trial testimony does not indicate precisely what they intended to accomplish at this "relatively short meeting," these officials apparently hoped to make a cursory inspection of the property to determine the extent to which it could be classified as wetlands and the extent to which unauthorized filling activity had already occurred. Steven Spencer, a DNR district supervisor present at the meeting, testified that, had they been granted access to the property, the DNR officials likely would have made a "wetlands determination" (a routine, generally visual inspection to determine whether a tract of land contains any wetlands). At any rate, all of the parties agree that the DNR did not plan to conduct a full-blown "wetlands delineation," which would have involved the taking of numerous soil and plant samples, among other things. Mr. Rapanos, in fact, testified that none of the DNR officials present had the "ability or capacity" to perform a delineation. Moreover, all of the parties agree that, whatever its purpose, the meeting ended when the defendant refused to allow the DNR officials onto the property without a search warrant.

The second meeting occurred on August 30, 1989, at the corporate headquarters of the defendant's Rapanos Investments Group. This meeting proceeded in much the same manner as the first, with Mr. Rapanos denying the officials access to the Salzburg Road Property. The DNR investigators ultimately obtained a search warrant, which they executed on November 7, 1989. At this point, they took numerous plant and soil samples and were able to document the presence of at least 28 acres of wetlands notwithstanding their significant degradation.

## II.

### A.

On April 13, 1994, a federal grand jury charged the defendant with knowingly discharging pollutants into wetlands in violation of 33 U.S.C. § 1311(a), stemming from the clearing and filling activities at the Salzburg Road Property. Although the defendant's first trial on these charges ended in a mistrial, some aspects of it—particularly the trial court's ruling regarding whether the defendant had a Fourth Amendment right to preclude a warrantless inspection of his property—are relevant to this appeal.

In its opening statement at the first trial, the government alluded to the defendant's refusal to allow a warrantless inspection of his property by DNR officials on August 22 and August 30, 1989. The government's first witness testified in greater detail about the defendant's refusal, which prompted the defense to object on the basis that this testimony constituted an improper comment on the defendant's assertion of his Fourth Amendment right to be free from unreasonable searches and seizures. The parties then submitted memoranda of law on the issue to the trial court, which, after reviewing these memoranda during a five minute break in the trial, ruled that the testimony was admissible. The defense later objected to Charles Dodgers's testimony about observations that he made during five warrantless entries onto the property during the spring and summer of 1989. The government responded that the objection was not timely because it should have been made in a motion *in limine*. The government also filed a brief with the court discussing the open fields doctrine and its relevance to Mr. Dodgers's inspections of the property. The court ultimately admitted the

testimony on the basis that the defendant's suppression motion was not timely made. It is not clear whether the court considered the open fields argument. The case proceeded for several weeks after these rulings until a mistrial was declared due to juror scheduling problems.

After the mistrial, a grand jury re-charged the defendant with unlawfully filling wetlands in violation of 33 U.S.C. § 1311(a) in two counts of a four-count superseding indictment. Although the defendant obviously knew that the government would again seek to introduce testimony about the defendant's assertion of his alleged Fourth Amendment rights, he filed no motion *in limine* addressing the issue. The second trial began on February 1, 1995, and during this trial both parties examined witnesses during the government's case-in-chief about the defendant's refusal to allow the DNR officials onto his property without a search warrant. The defense did not object to the government's introduction of this evidence but rather cross-examined the government's witnesses. The August meetings were also discussed during the defendant's case-in-chief, especially when the defendant was cross-examined without objection about his conduct at these meetings. The following colloquy occurred during this cross-examination:

Q. And this August 30th meeting, again, you had not let the DNR on the property?

\* \* \*

A. He [Jake Allan, the defendant's attorney] told him just point blank, you will not be allowed on the property.

Q. And you agreed with that?

A. He said you cannot go on the property without a search warrant, I think.

Q. And you said the same thing?

A. [not responsive]

Q. I would like you to answer the question, though. You also told the DNR that they could not go back on the property without a search warrant?

A. I didn't say those words.

Q. Words to that effect?

A. No.

Q. Since you were certain in your own mind that there were no wetlands there, why not let the DNR on the property?

A. It's not my decision.

Q. Were you practicing concealment again?

A. They could get a search warrant, Miss Parker, and they could go out there the next day if they wanted to. We couldn't stop them, okay. There's no concealment. They know the procedure. First of all, they were trespassing on our property. Jake was very upset about that. He said, look, you don't go on any of our properties ever again. Don't you dare go on there without our permission or a search warrant. That's what was said [at] that meeting.

Q. So were you practicing concealment, or not?

A. No.

\* \* \*

Q. So you weren't willing to say, don't worry, I have nothing to hide, let them on?

A. I don't think that came up.

Q. All right. And as a client, you have the ability to do that; right? To say to your attorney, look, go ahead, let them on.

A. I learned a long time ago, that if you don't take your attorney's advice you shouldn't have him . . . .

Q. So the bottom line is, though, you knew that you could talk to him about that and try to convince him to do that and you chose not to?

A. It didn't happen.

As noted earlier, the defense did not object to this line of questioning. The trial then continued for two-and-a-half weeks longer, during which the parties presented detailed evidence about the nature of wetlands and the activities on the Salzburg Road Property. After hearing all of this evidence, the jury found the defendant guilty on both counts of wetlands degradation.

## B.

Immediately after the jury returned its guilty verdict, the defendant moved for an extension of time to file a motion for judgment of acquittal pursuant to FED.R.CRIM.P. 29. The trial court granted the extension, and within the extended time the defendant filed a "Motion for Judgment of Acquittal and a New Trial" and a 46–page supporting brief. This motion offered 10 grounds for relief, including prosecutorial misconduct. On the basis of this brief and the government's response brief, the trial court denied the motion for acquittal but granted the motion for a new trial.

The opinion and order granting the new trial did not discuss the arguments raised by the parties other than to reject the defendant's allegations of prosecutorial misconduct. Instead, the district court based its decision on the government's cross-examination of Mr. Rapanos, specifically, the questions about whether the defendant was "practicing concealment" when he refused to consent to warrantless searches of his property by the DNR officials. Although the defense raised no objection to this testimony during the second trial, the court concluded that its introduction impermissibly infringed upon the defendant's Fourth Amendment rights and constituted "plain error" under FED.R.CRIM.P. 52(b):

> At the time of the cross examination, the Court was deeply concerned about the prejudicial effect of such questioning, finding it akin to comments regarding a defendant's silence following *Miranda* warnings. The Court was prepared to offer a curative instruction, however, the questioning proceeded without objection from the defense.

> During the course of the trial the objections from each side had been so numerous, that, when defense counsel failed to object, the Court was loath to interfere. It was the perception of the Court at the time that the decision not to object must have been strategic, and it is generally the Court's policy to allow attorneys latitude in the manner of presentation of their cases. Upon consideration and review, the Court finds that it was plain error to allow the discourse to continue.

As this excerpt from its opinion suggests, the district court drew an analogy to Supreme Court cases holding that a prosecutor or trial judge cannot comment on a defendant's exercise of his Fifth Amendment right against self-incrimination. See, *e.g., Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (a defendant's silence following *Miranda* warnings cannot be used to impeach an exculpatory story told for the first time at trial); *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (a prosecutor's comment regarding the defendant's failure to testify at trial violates the self-incrimination clause of the Fifth Amendment). The district court noted that in recent years some courts have extended this rule to prohibit prosecutorial comment on a defendant's exercise of his Fourth Amendment rights. For instance, the district court discussed at some length the decision in *United States v. Thame,* 846 F.2d 200 (3rd Cir.), *cert. denied,* 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 333 (1988), which held that it was error, although not plain error on the facts of that case, for a prosecutor to comment on a defendant's refusal to consent to a warrantless search of a piece of luggage. Distinguishing *Thame,* the court concluded that on the facts of the instant case, the questions about "practicing concealment" did amount to plain error:

> In *Thame,* the Court found that there was overwhelming evidence of the defendant's guilt from which the jury could reach a decision, and therefore the comments were *not* "sufficiently major that a miscarriage of justice will result if the conviction is not reversed." (Internal citation omitted). This Court cannot reach the same conclusion in the instant action.

> It is the opinion of the Court, after viewing the entirety of the trial, that a reasonable jury could have rendered either verdict.... In such a situation, an unchecked prejudicial comment may indeed have tipped the scales in favor of conviction.

Accordingly, the court granted the defendant a new trial. The district court denied the government's motion for reconsideration and the government filed a timely notice of appeal. This court has jurisdiction to review

the decision of the district court pursuant to 18 U.S.C. § 3731 (1988).

## III.

■ The government asserts that the district court did not have jurisdiction to grant a new trial because the defendant failed to file a motion for a new trial within seven days after the guilty verdict. See FED.R.CRIM.P. 33; *United States v. Koehler,* 24 F.3d 867, 869 (6th Cir.1994), *cert. denied,* 513 U.S. 1077, 115 S.Ct. 723, 130 L.Ed.2d 628 (1995) (a court lacks jurisdiction to consider on the merits an untimely motion for new trial). Immediately following the jury verdict, Mr. Rapanos moved for an extension of time to file a "Motion for Delayed Verdict of Acquittal," and the district court granted him twenty-one days to file his motion. Between the seventh and twenty-first days of this period, he filed a "Motion for Judgment of Acquittal and a New Trial." We believe it was reasonable for the district court to treat the request for an extension as applying to a motion for a new trial as well as to a motion for acquittal. Thus, the motion actually filed within the period of the extension was timely and the district court had jurisdiction to consider its merits.

## IV.

### A.

■ This court reviews a district court's order granting or denying a motion for a new trial under an abuse of discretion standard. *United States v. Breinig,* 70 F.3d 850, 852 (6th Cir.1995). As the *Breinig* court explained, "[t]he narrow standard of review corresponds to the rationale underlying FED. R.CRIM.P. 33 that 'the trial judge, not an appellate court reading a cold record, can best weigh the errors against the record as a whole to determine whether those errors in the conduct of the trial justify a new trial'." *Id. (quoting United States v. McBride,* 862 F.2d 1316, 1320 (8th Cir.1988)).

### B.

Unless the defendant had a Fourth Amendment right to prevent the DNR representatives from coming onto the Salzburg Road Property for an inspection, the entire premise for the district court's "plain error" ruling is flawed. In the absence of a constitutional right that could be exercised, comments on the defendant's efforts to bar the entry were not prejudicial in the sense found by the district court. To determine whether Mr. Rapanos possessed a Fourth Amendment right to bar the DNR representatives' entrance, we must consider the open fields doctrine.

The open fields doctrine, as enunciated by the Supreme Court in *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), and reaffirmed in *Oliver v. United States,* 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), holds that the government's intrusion onto open fields without a search warrant "is not one of those 'unreasonable searches' proscribed by the text of the Fourth Amendment." *Oliver,* 466 U.S. at 177, 104 S.Ct. at 1740. The doctrine stems from the Supreme Court's observation that the Fourth Amendment refers only to "persons, houses, papers, and effects" (and not to fields) and the Court's belief that society is not prepared to recognize as reasonable an individual's subjective expectation of privacy in an open field. *Id.* at 176–80, 104 S.Ct. at 1740–42. The Supreme Court, moreover, has made clear that the application of this doctrine does not turn on the nuances of particular cases and that trial courts should not adopt an ad hoc approach to evaluating whether an individual has a reasonable expectation of privacy in a particular open field. The rather typical presence of fences, closed or locked gates, and "No Trespassing" signs on an otherwise open field therefore has no constitutional import. *Id.* at 181–82, 104 S.Ct. at 1742–43.

## V.

### A.

■ We have no difficulty finding that the Salzburg Road Property should be considered open fields. The property consists of 175 acres, contains no buildings, and is bordered by an interstate highway and a major state highway. Although largely forested

prior to 1988, the land has since been almost entirely denuded of trees and other vegetation due to Mr. Rapanos's clearing and sand-filling projects. Mr. Rapanos argues that the land cannot properly be characterized as open fields because: (a) it is surrounded by a fence and a tall "hedgerow" of cleared debris; (b) entry onto the land can be made only through a locked gate; and (c) by the time of the DNR's attempted searches in August 1989, "the land had undergone extensive alteration and development for one economic purpose or another and was clearly 'commercial property'."

None of these factors, however, has any bearing on whether the property is open fields. The Supreme Court has defined open fields so broadly that, for constitutional purposes, even property that is neither open nor a field (such as a thickly wooded area) can be treated as an open field. *Oliver,* 466 U.S. at 180 n. 11, 104 S.Ct. at 1742 n. 11. As noted earlier, moreover, the presence of a fence or gate or a "No Trespassing" sign does not engender a reasonable expectation of privacy for Fourth Amendment purposes. *Id.* at 182, 104 S.Ct. at 1743; see also *United States v. Burton,* 894 F.2d 188, 190 (6th Cir.), *cert. denied,* 498 U.S. 857, 111 S.Ct. 157, 112 L.Ed.2d 123 (1990). Finally, although there is some intuitive appeal to the defendant's argument that the open fields doctrine cannot apply to land that has been developed or prepared for development, the Supreme Court's decision in *Dow Chemical Co. v. United States,* 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986), undermines that contention entirely. The *Dow* court held that even a 2,000 acre industrial complex is "more comparable to an open field" than to curtilage in which a landowner has a reasonable expectation of privacy. *Id.* at 239, 106 S.Ct. at 1827. Given the Supreme Court's holdings in this area, there is no doubt that the Salzburg Road Property is open fields.

The defendant attempts to distinguish his situation from the run-of-the-mill open fields case involving a warrantless search of a secluded marijuana patch by reason of the fact that he was present on August 22 and August 30 when the government agents attempted to gain access to his property. The defendant suggested at oral argument that when a landowner is present there is a great risk of violence if an angry property owner uses force or threats of force to deny access to his property. Perhaps as a matter of public policy the defendant's suggestion makes good sense. Adopting such a rule, however, would put this court directly in conflict with the Supreme Court's definition and application of the open fields doctrine.

The tacit assumption behind the defendant's position appears to be that a landowner's presence at the time of a search or attempted search creates a reasonable expectation of privacy. In essence, the defendant argues for a case-by-case determination as to whether the landowner sufficiently established a reasonable expectation of privacy in his land. But, as this court noted in *Burton,* the Supreme Court has expressly rejected this practice to avoid the "danger that constitutional rights will be arbitrarily and inequitably enforced." *Oliver,* 466 U.S. at 181–82, 104 S.Ct. at 1743. Although a landowner who is present and attempting to bar entry may have a *subjective* expectation of privacy, the Supreme Court has rejected "the suggestion that steps taken to protect privacy establish that expectations of privacy in an open field are legitimate." *Id.* at 182, 104 S.Ct. at 1743. For constitutional purposes, therefore, a landowner's presence does not differ in consequence from the erection of a fence or "No Trespassing" sign: none of these actions creates a reasonable expectation of privacy in open fields.

**B.**

The defendant's further argument on appeal is that the open fields doctrine is not applicable on the facts of this case because the doctrine permits only visual inspections (as opposed to seizures) of property. See *Allinder v. Ohio,* 808 F.2d 1180, 1185 (6th Cir.1987) ("[T]he Supreme Court has consistently adhered to the open fields doctrine while at the same time recognizing that it is limited in scope to 'sights seen in "the open fields"'."); *Husband v. Bryan,* 946 F.2d 27, 29 (5th Cir.1991) ("Neither this court nor the Supreme Court have extended the open fields doctrine to anything beyond observa-

tion searches."). Thus, in typical open fields cases where police officers have spied evidence of the manufacture or possession of illegal drugs, those officers usually have obtained a warrant before actually seizing the evidence. See, *e.g., Oliver,* 466 U.S. at 174, 104 S.Ct. at 1739; *United States v. Dunn,* 480 U.S. 294, 298, 107 S.Ct. 1134, 1138, 94 L.Ed.2d 326 (1987).

■ The defendant argues that the DNR contemplated undertaking "full scale seizure activity." The record does not support his argument. Everyone who attended the August 22 and August 30 meetings, Mr. Rapanos included, agreed that the DNR inspectors did not intend to conduct a full-scale wetlands delineation. The testimony of the DNR inspectors indicates that they intended to point out to Mr. Rapanos what portions of his property qualified as wetlands and that they hoped to determine the extent to which the defendant had destroyed these wetlands by filling them with sand. Significantly, the record contains no direct evidence that the DNR officials intended to do anything but make visual inspections of the property and discuss with the defendant his need to obtain an environmental permit. Further, defense counsel made no attempt to elicit from the witnesses any testimony that would support the defendant's present argument that the DNR inspectors intended to seize soil and plant samples during the August meetings and attempted entries. The defendant suggests that this court should look at the DNR's activity on November 7, 1989, when the inspectors performed something approaching a full-scale wetlands delineation involving at least 35 soil samples and numerous plant samples. The problem with this argument is that the activity on that date occurred after the execution of a federal search warrant. Thus, there is no basis for comparing this activity to whatever the DNR might have hoped to accomplish at the August meetings.

## C.

■ Since the Supreme Court's decision in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the touchstone of Fourth Amendment analysis "has

been the question whether a person has a 'constitutionally protected reasonable expectation of privacy'." *Oliver,* 466 U.S. at 177, 104 S.Ct. at 1740–41 *(quoting Katz,* 389 U.S. at 360, 88 S.Ct. at 516 (Harlan, J., concurring)). If a person cannot establish a reasonable expectation of privacy, then the government's search of his property simply does not implicate the Fourth Amendment. Mr. Rapanos has not shown that the DNR officials intended to do anything but make a visual inspection of his property on August 22 and August 30, 1989. Under *Oliver,* a visual inspection made during a warrantless entry onto open fields does not constitute an unreasonable search for Fourth Amendment purposes.

### CONCLUSION

■ In the absence of a Fourth Amendment right to bar entry by the DNR personnel, Mr. Rapanos's efforts amounted to no more than a protest against a common law trespass. This being so, the prosecutor's questions and characterization did not constitute a prejudicial comment on a defendant's assertion of a constitutional privilege.

This is one of those rare cases in which we are convinced that the district court abused its discretion by granting a new trial. A ruling based on a failure to apply settled law is an abuse of discretion. See *Southward v. South Central Ready Mix Supply Corp.,* 7 F.3d 487, 492 (6th Cir.1993) (a district court abuses its discretion "when it improperly applies the law or uses an erroneous legal standard."). Since *Oliver,* it is no longer open to question that the Salzburg Road Property is open fields. Thus, the district court did not commit plain error by failing to exclude the questioning upon which it based its new trial order. If defense counsel had objected, the court properly could have stopped the prosecutor from badgering and arguing with the witness. But there was no constitutional basis for excluding the questions and comments.

The judgment of the district court is **REVERSED,** and the jury's verdict is reinstated. The case is **REMANDED** to the district court for sentencing.

DAVID A. NELSON, Circuit Judge, dissenting.

Rule 33, Fed.R.Crim.P., authorizes the granting of a new trial "if required in the interest of justice." Judge Zatkoff, the district judge who conducted both of defendant Rapanos' trials, concluded that "a miscarriage of justice will result" if Mr. Rapanos is fined or sent to prison on the strength of a verdict returned by a jury that saw the defendant raked over the coals in cross-examination for electing to exercise rights which the judge believed were secured by the United States Constitution. *United States v. Rapanos*, 895 F.Supp. 165, 169 (E.D.Mich.1995) (quoting *United States v. Thame*, 846 F.2d 200, 207 (3d Cir.), *cert. denied*, 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 333 (1988)).[1]

Judge Zatkoff knew far more about this complex criminal case than I do. Given the respect to which his view of the case is entitled, I find myself unable to conclude that Judge Zatkoff abused his discretion in determining that the interest of justice required a new trial. I agree with the conclusion reached by my colleagues on the panel as to the timeliness of the defendant's post-trial motion, but I respectfully dissent from the panel's decision to reinstate a verdict which the trial court found to be tainted.

## I

If error has crept into the trial of a criminal case, as the majority opinion notes (quoting *United States v. Breinig*, 70 F.3d 850, 852 (6th Cir.1995), which in turn quotes *United States v. McBride*, 862 F.2d 1316, 1320 (8th Cir.1988)), the judge who presided at the trial is the person best situated to "weigh the errors against the record as a whole" in order to determine whether a new trial is justified. A judge who has seen and heard the entire proceeding, listening to all the evidence and arguments of counsel and perhaps sensing the reactions of the jurors, will obviously have a better feel for the case

than "an appellate court reading a cold record...." *Breinig, id.* The trial judge, accordingly, will be in a much better position to determine the need for a new trial than any appellate panel can hope to be. See *United States v. Draper*, 746 F.2d 662, 665–66 (10th Cir.1984).

Where, as is true here, large portions of the trial proceedings have been omitted from the transcript furnished the appellate panel, the panel cannot even attempt "[to weigh] the record as a whole." Accordingly, unless Judge Zatkoff was clearly wrong in concluding that he should have stopped the prosecution from cross-examining defendant Rapanos about what the defendant was trying to hide when he refused to let a team of government investigators enter his property, it seems to me that we have no sensible alternative but to let the retrial order stand.

My understanding of the factual background differs in a few respects from that reflected in the majority opinion. Before addressing the legal question, therefore, it may be helpful for me to sketch out some of my factual assumptions.

## II

Two senior government ecologists inspected Mr. Rapanos' Salzburg Road land with Rapanos and his lawyer on March 1, 1989, in order to determine if there were regulated wetlands on the site. On the basis of this on-site inspection, as one of the ecologists subsequently testified, the officials made a determination that the property contained "rather extensive wetlands."

The officials did not collect soil samples and vegetation specimens on March 1—as they would have done had they intended to delineate the boundaries of the wetlands—but one of them, Regional Supervisor Richard Sikkenga, wrote the words "wetland DET[ERMINATION]" in his daily journal.[2]

---

1. The "interest of justice" standard is such a broad one that the granting of a new trial is not necessarily dependent upon the trial court's concluding that it committed legal error. In the interest of justice, a trial court may grant a new trial based on reconsideration of its disposition of any discretionary matter. See *United States v. Vicaria*, 12 F.3d 195, 198 (11th Cir.1994).

2. The other official, Hal Harrington, testified that a "determination" involves the question whether wetlands are present on a site at all, while a formal "delineation" is an exercise that results in

The officials told Mr. Rapanos and his lawyer that a delineation of the wetlands would be necessary before a permit could be issued for commercial development of the property. It might take the Department of Natural Resources months to find time for performing a delineation, the officials said, and they recommended that Mr. Rapanos have the delineation done by an outside consultant instead.

Mr. Rapanos subsequently engaged Dr. Frederick Glenn Goff for this purpose, selecting him from a consultants' list prepared by the state. On March 16, 1989, Dr. Goff met on the site with Regional Director Sikkenga and Charles Dodgers, a member of Mr. Sikkenga's staff. Among the subjects discussed were the methodology to be used in performing a delineation and the locations at which cores of soil would be extracted. Mr. Rapanos did not attend this particular on-site session, but his lawyer, Jake Allen, did attend. Mr. Allen was undoubtedly privy to the discussion about extracting core samples from various parts of the property.

The preliminary results of Dr. Goff's delineation studies did not satisfy Mr. Rapanos, and Dr. Goff was discharged. Mr. Rapanos seems to have felt, rightly or wrongly, that like two consultants who followed him, Dr. Goff was trying to curry favor with the Department of Natural Resources, thereby protecting his consulting business, by treating as "wetlands" areas that were not in fact wetlands under what Rapanos conceived to be a commonsense view of things.

Mr. Rapanos thought of wetlands in terms of swamps, or marshes, or bogs. He ultimately took the position that for the most part, at least, his Salzburg Road property— which had been heavily wooded until he set up a sawmill and cut the timber—was simply not subject to regulation under a statute dealing with the discharge of pollutants into the nation's navigable waters.

Notwithstanding the absence of a comprehensive wetland delineation, and proceeding without a permit, Mr. Rapanos removed (or ground up) tree stumps, shrubs, and other vegetation from the Salzburg Road property; tilled and graded the soil; and brought in a considerable quantity of sand. Mr. Dodgers, of the Department of Natural Resources, entered the site repeatedly during May, July, and August of 1989 and observed the progress of the work on areas that he considered to be wetlands. Mr. Dodgers took a series of photographs, some of which were introduced in evidence at trial.

Mr. Dodgers drafted a cease and desist order that was issued by District Supervisor Steven Spencer on July 24. Dodgers then conducted three on-site inspections—taking photographs each time—after the cease and desist order had been issued. These inspections took place on August 9, 10, and 14. Finally, on August 22, 1989, a team of five DNR officials—Harrington, Sikkenga, Spencer, Dodgers, and Program Coordinator Peg Bostwick—met with Mr. Rapanos at the entrance to his property.

During the second trial of the case, the prosecutor repeatedly tried to get Mr. Rapanos to admit that he was told on August 22 that the team had been assembled "to do a wetland delineation." [3] Mr. Rapanos denied having been told this, and his testimony seems consistent with that of at least some of

---

quite a precise demarcation of the boundaries of the wetlands. The usage in the trial record is far from consistent, even on Mr. Harrington's part, and a Corps of Engineers "Wetlands Delineation Manual" that was received in evidence seems to use the terms interchangeably. The manual indicates that where on-site inspections are necessary, even "routine determinations"—to say nothing of "comprehensive determinations"—may entail digging soil pits at representative locations and taking samples of soil from beneath the surface.

**3.** The understanding that a "delineation" was intended is also reflected in a trial brief filed by the government on July 5, 1994, during the course of the first trial. In response to an objection to the cross-examination of Mr. Rapanos about his refusal to let the team on the property prior to the issuance of a search warrant, the brief argued that the government was entitled to show that "the main reason that the DNR could not make an earlier (and hence more accurate and complete) *delineation* of the wetlands on defendant's property was that *defendant prevented DNR from entering the property . . . at an earlier time,* thereby giving defendant more time in which to alter the condition of the land." (Emphasis supplied.) The government did not cite the "open fields" doctrine at all in this connection.

the state witnesses. Whether or not a delineation had been planned for August 22, however, it appears to be beyond dispute that members of the team gave Mr. Rapanos to understand that *at some point* they intended to perform a delineation. Mr. Rapanos took vigorous exception to their doing so.

According to testimony given at the second trial by Program Coordinator Peg Bostwick, Mr. Rapanos was

"unwilling to accept any delineation or mapping of wetland boundaries on the property by our staff. He indicated he felt that there were differences between state methods and federal methods that made it too confusing. There was discussion about that with our staff. Our staff attempted to clarify for him that there was not a great deal of difference, but all he needed to do was to follow the state law. He indicated that was not satisfactory.

\* \* \*

He indicated that until he researched the subject and came up with a method of mapping wetland boundaries that was acceptable to him, he would not accept any definition of boundaries that we would make on that property."

Mr. Rapanos and his lawyer undoubtedly understood that the work which the DNR expected to perform on the Salzburg Road property would entail the collection of a significant quantity of physical evidence. Subsequent events support that understanding. On November 7, 1989, an expanded team from the DNR went on the property with a search warrant. Although the team still did not perform a comprehensive delineation— the government has acknowledged that no such delineation was ever performed on the property—a member of the team used a bucket auger to extract 12-inch soil samples from up to five feet below the surface of the ground. Thirty-five such samples were bagged and taken off the property, along with numerous specimens of vegetation.

Mr. Rapanos was unwilling to give his consent to any of this, at least in the absence of a satisfactory understanding on the standards to be used by the people doing the work. He made his position clear to the DNR team at the meeting on August 22, and he adhered to that position at a meeting he and his lawyer had with Messrs. Harrington and Spencer on August 30.

It was not just a cursory inspection for which consent was being withheld. (There had been many such inspections already, of course.) Rapanos and his lawyer must have known that the DNR officials wanted physical evidence—the taking of soil samples had been discussed as early as March 16, it will be recalled, in the presence of lawyer Allen— and Rapanos and Allen were insisting that the officials get a search warrant before entering the property. Judge Zatkoff ultimately concluded that Mr. Rapanos had a constitutional right to insist on the warrant—and if my understanding of the facts is correct, I think he did too.

III

I agree with my colleagues on the panel that the Salzburg Road property must be treated as "open fields." We are also in agreement, I believe, on the proposition that the open fields doctrine is limited in scope to what can be seen in such fields. See, in this connection, *Allinder v. State of Ohio,* 808 F.2d 1180, 1184–86 (6th Cir.1987), and the cases there cited. The open fields doctrine does not give the government *carte blanche* to mine evidence from beneath the surface of the fields. Yet here the jury heard extensive testimony about the taking of soil borings, and the jury could fairly have inferred that this was one of the things to which Mr. Rapanos and his lawyer were unwilling to agree. I have no doubt that Judge Zatkoff drew such an inference.

The cross-examination to which Mr. Rapanos was subjected is far too long to be set forth in its entirety, and the passages excerpted in the majority opinion give an accurate sense of what the prosecutor was up to. One further passage may be of interest, however:

"Q. What were you trying to hide?

A. I'm sorry?

Q. What were you trying to hide?

A. Nothing. I'm just following orders.

Q. Who is the boss, you or Mr. Allen?

A. In that respect, Mr. Allen.

Q. So you and Mr. Allen were trying to hide something?

A. No."

This exchange appears in the transcript only a page or two after the prosecutor attempted to establish that Mr. Rapanos understood that the purpose for which the DNR team had gathered at the site on August 22 was to perform a wetland delineation forthwith.

The district court's published opinion on the granting of a new trial speaks for itself, and I shall not attempt to summarize the opinion here. We must not forget the context in which the district court rendered its decision, however, and in this connection it seems to me that the following circumstances deserve emphasis:

— The evidence of the defendant's guilt was far from overwhelming, and the jury's verdict could have gone either way in this case. 895 F.Supp. at 169–70.

— At one stage in its deliberations the jury even reported a deadlock, "with several people on each side that say they won't change their minds." *Id.* at 170.

— Although the defendant was not entitled to an acquittal on the basis of prosecutorial misconduct (among other things, the defendant had objected to being likened to the devil and to having his treeless property compared to the Warsaw ghetto without Jews), there was certainly "prosecutorial overkill" in this case. *Id.* at 169.

A circumstance not mentioned by the district court, but one that strikes me as significant, is that the jury heard a great deal about Mr. Rapanos attempting to hide the findings made by Dr. Goff on the extent to which there were wetlands on the Salzburg Road property. I do not mean to suggest that the prosecutor was guilty of any impropriety in this connection. I do think, however, that the Goff situation was likely to have lent particular bite to the cross-examination of Mr. Rapanos about what he was trying to hide by refusing to let a DNR team enter his property.

I am far from sure, based on what I have been able to read, that I would have granted a new trial had I been in Judge Zatkoff's shoes. But I was not in his shoes. For reasons indicated above, I know less about the case than Judge Zatkoff did. And whether Judge Zatkoff was right or wrong in his assessment of the interest of justice, I am not persuaded that he abused his discretion in making the judgment call he did. I would let the order for a new trial stand.