*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0354p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
————————————

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee*,

            *v.*

JAMES MATHIS (12-6256) and DONALD
FILLERS (12-6354),
            *Defendants-Appellants*.

Nos. 12-6256/6354

Appeal from the United States District Court
for the Eastern District of Tennessee of Chattanooga.
No. 1:09-cr-00144—Curtis L. Collier, Chief District Judge.

Argued: December 5, 2013

Decided and Filed:  December 23, 2013

Before:  SILER, COLE, and COOK, Circuit Judges.

————————————

## COUNSEL

**ARGUED:** Robin R. Flores, Chattanooga, Tennessee, for Appellant in 12-6256.  Leslie A. Cory, Chattanooga, Tennessee, for Appellant in 12-6354.  Matthew T. Morris, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Robin R. Flores, Chattanooga, Tennessee, for Appellant in 12-6256.  Leslie A. Cory, Chattanooga, Tennessee, for Appellant in 12-6354.  Matthew T. Morris, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, Allen M. Brabender, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

————————————

## OPINION

————————————

    COLE, Circuit Judge.  After a three-week jury trial, James Mathis and Donald Fillers were convicted of conspiracy, 18 U.S.C. § 371, and violations of the Clean Air Act, 42 U.S.C. § 7413(c).  Fillers was also convicted of making a false statement,

18 U.S.C. § 1001(a)(2), and obstruction of justice, 18 U.S.C. § 1519. The district court denied Fillers's motion to suppress and Mathis's and Fillers's motions for a judgment of acquittal. It sentenced Mathis to 18 months' imprisonment and Fillers to 44 months' imprisonment. Mathis and Fillers raise several challenges to their convictions and sentences, but ultimately we affirm.

## I.  BACKGROUND

Donald Fillers ("Fillers") and his brother Gary formed Watkins Street Project, LLC, in 2003 to develop an unused factory site in Chattanooga, Tennessee. They planned to demolish the factory and sell the salvageable materials, but they knew the site contained asbestos. Asbestos is a fibrous mineral formerly used as insulation, and some forms of asbestos crumble and release microscopic fibers into the air when disturbed. Inhalation of asbestos fibers can cause fatal and debilitating illnesses.

The Clean Air Act lists asbestos as a hazardous pollutant, and the Environmental Protection Agency has developed work-practice standards for the demolition of buildings that contain asbestos. The standards require the removal of all asbestos before any demolition that would dislodge the material. These standards also specify removal procedures. For example, asbestos materials must be wetted before removal, lowered to the ground rather than dropped, labeled, and disposed of at a site authorized to accept asbestos. Owners and operators of demolition activities must also give notice, including a description of the location and amount of asbestos, to the EPA ten days before demolition. The Clean Air Act makes it a crime for individuals to violate these standards.

Gary hired Alternative Actions, Inc., a certified asbestos surveying company, to estimate the amount of asbestos at the factory site and the cost of removal. The survey revealed a large amount of duct, pipe, and equipment insulation containing asbestos. Alternative Actions estimated that it would cost $214,650 to remove the contaminated material safely.

Fillers then hired Mathis Companies, Inc., a demolition company owned by James Mathis, to tear down the factory in exchange for some of the salvageable materials. Mathis was also required to use a certified contractor to remove the asbestos. Mathis requested a bid from SCI Remediation, which toured the site, reviewed the Alternative Actions survey, and estimated that it would cost $129,250 to remove the asbestos. Fillers believed that the removal could be done for much less—about $20,000 total—so he rejected the SCI bid and told Mathis that Watkins Street would find a different asbestos-removal company.

Fillers asked two other asbestos-removal companies to submit estimates. He provided the Alternative Actions survey to one company, which returned a bid of $126,542. Fillers provided an incomplete version of the survey to the other company, which ultimately decided not to bid. Gary then contacted ADC Systems, an asbestos-removal company managed by Halbert Warden and his father. Fillers told ADC that no asbestos survey had been prepared. Based on an "initial walk through," ADC estimated the cost of removal at $28,900, and the Fillers brothers accepted the bid.

In August 2004, Mathis visited the Chattanooga-Hamilton County Air Pollution Control Bureau to submit the 10-day notice and permit application for demolition. The Bureau works with the EPA to enforce the Clean Air Act in Chattanooga. The estimated amount of asbestos in the notice was far less than in the Alternative Actions survey. Kathy Jones, the Bureau's air monitoring manager and asbestos coordinator, accepted the notice from Mathis and later contacted Fillers to verify the amount of asbestos and request a copy of the survey. Fillers did not send the survey, but instead provided a revised asbestos estimate that was still far less than the survey's estimate. Jones approved the application and sent permits to Warden, Mathis, and Gary.

ADC began removing the asbestos. ADC's initial contract was limited to the factory's boiler room, but Warden noticed "mass bunches of asbestos" outside the ADC work area. Warden mentioned the additional asbestos to Gary, and Watkins Street increased the scope of ADC's work order. This change, however, still did not cover all the asbestos at the site: Warden later testified that ADC removed "[m]aybe, like,

1/100th" of the asbestos listed in the Alternative Actions survey. After finishing the work they were authorized to perform, ADC left the site.

Watkins Street hired temporary laborers to remove debris and salvage materials from the site. These workers were not equipped with protective gear or trained to remove asbestos. Fillers helped supervise the team, which did not take special precautions with material (such as insulation) that likely contained asbestos. The workers used power tools to cut through pipes that were wrapped in insulation, threw debris out of windows so that it fell to the ground, removed insulation by hand, and otherwise disposed of insulation without wetting, containerizing, or labeling it.

Mathis and his company would then demolish each section the salvage team cleared. The salvage team worked in the afternoons and at night; the demolition team worked in the mornings. Mathis knew, however, that the salvage team was improperly removing asbestos because Warden told him as much when he returned to the site after ADC had finished its work. During this visit, Warden pointed out loose materials containing asbestos strewn about the site. Mathis replied, "Halbert, Don is not going to pay for anything else." Warden later visited the site two more times, each time telling Mathis that there was asbestos "all over the ground." Mathis responded that Fillers would not pay for further asbestos removal and that he was tired of arguing with Fillers about it. Mathis then continued demolishing the factory.

The demolition and salvage teams' work dispersed dust throughout much of the site and surrounding neighborhood. An employee of a nearby daycare facility later testified that the air in the area was so contaminated that the children at the daycare were unable to play outside.

In September 2005, an investigator from the Air Pollution Control Bureau, John Schultz, observed the site during a routine patrol. He later testified that the site "looked like a bomb had gone off," and that there were "debris piles over the entire city block." Because of disagreements between Mathis and Fillers, no one had worked on the site for at least a month. There were no signs, fences, or security guards to keep the public off of the site. Schultz thought the debris contained asbestos, so he briefly explored the

demolition area.  He returned the next day with Kathy Jones, who reported that "[t]he site appeared to be littered with suspect asbestos-containing materials."  They collected samples of the materials, which later tested positive for asbestos.

The Bureau then contacted the EPA, which sent an emergency response coordinator to the site.  The EPA coordinator declared the site an imminent threat to human health and the environment and ordered Watkins Street to clean up the debris using a certified asbestos-removal company.  Watkins Street completed the cleanup in October 2005.

The United States charged Mathis and Fillers, among others, with conspiracy to defraud the United States and to violate the Clean Air Act (count 1), substantive violations of the Clean Air Act (counts 2–4), and making false statements (counts 8 and 9).  The United States also charged Fillers with other substantive violations of the Clean Air Act (counts 5–7) and obstruction of justice (count 11).

A jury convicted Mathis of conspiracy and two substantive violations of the Act: failure to file an accurate 10-day notice, and commencement of demolition prior to removing asbestos from the site.  After a week-long sentencing hearing, the district court determined that Mathis's guidelines range was 27–33 months.  The court sentenced Mathis to 18 months' imprisonment.

The jury convicted Fillers of conspiracy, six substantive violations of the Act, making false statements, and obstruction of justice.  The substantive violations included the notice and removal violations, as well as failure to have present an individual trained in the work-practice standards during demolition, failure to wet the material containing asbestos during removal, failure to lower the material properly, and failure to containerize and timely dispose of the material.  The district court determined that Fillers's guidelines range was 46–57 months, and it sentenced him to 44 months' imprisonment.

Mathis and Fillers now challenge their respective convictions and sentences. We have jurisdiction to hear the appeal under 18 U.S.C. §§ 1291 and 3742.

## II.  ANALYSIS

Fillers attacks his convictions and sentence with arguments in four areas: warrantless search and seizure, admission of certain testimony at trial, sufficiency of the evidence, and calculation of sentencing guidelines.  Mathis joins Fillers with arguments in the last three areas.  We address each in turn.

### A.    Warrantless Search and Seizure

Fillers asks us to reverse the district court's denial of his motion to suppress the asbestos-containing samples.  When considering a motion to suppress, we review a district court's findings of fact for clear error and its conclusions of law de novo.  *United States v. Davis*, 514 F.3d 596, 607 (6th Cir. 2008).  We also consider the evidence "in the light most likely to support the district court's decision."  *Id.*  (citation and internal quotation marks omitted).

The district court adopted the magistrate judge's report and recommendation, which found that the Bureau employees' warrantless search and seizure did not violate the Fourth Amendment.  Entry onto and search of the property was lawful, the magistrate judge reasoned, because Fillers had no subjective expectation of privacy in the site and because the site qualified as an "open field."  Seizure of the samples was lawful, the magistrate judge concluded, under the plain view doctrine.  We agree.

### 1.    Warrantless Searches

When challenging the admission of evidence under the Fourth Amendment, it is the defendant's burden to show that he had a legitimate expectation of privacy in the area searched or items seized.  *United States v. Mastromatteo*, 538 F.3d 535, 544 (6th Cir. 2008).  If he does not meet this burden, the defendant lacks standing for his challenge.  *Id.*  A legitimate expectation of privacy exists when a defendant, "by his conduct, has exhibited an actual (subjective) expectation of privacy"—that is, has sought "to preserve something as private"—and when his "subjective expectation of privacy is one that society is prepared to recognize as reasonable."  *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (internal quotation marks and brackets omitted).

A defendant may exhibit a subjective (though not necessarily legitimate) expectation of privacy when, for example, he places trash in an opaque garbage bag and sets it on the street for the garbage collector to take to the dump, *see California v. Greenwood*, 486 U.S. 35, 39 (1988); maintains "elaborate security around the perimeter of [a] complex barring ground-level public views of these areas," *Dow Chem. Co. v. United States*, 476 U.S. 227, 229 (1986); erects a ten-foot fence to conceal his yard from street-level views, *California v. Ciraolo*, 476 U.S. 207, 211 (1986); closes himself in a phone booth to place a call, *Katz v. United States*, 389 U.S. 347, 352 (1967); stows a zipped luggage bag in the bedroom closet of an apartment at which he was temporarily staying, *United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005); or hides cocaine in a shoe box in the basement rafters of the duplex in which he lived, *United States v. King*, 227 F.3d 732, 754 (6th Cir. 2000) (Cole, J., concurring). Key to these cases is that the defendant showed, not merely by his statements during litigation, but by his conduct, that he sought to preserve something as private.

A defendant's expectation of privacy in an open field, however, is not recognized by society as reasonable. *Oliver v. United States*, 466 U.S. 170, 179 (1984). In other words, "no expectation of privacy legitimately attaches to open fields." *Id.* at 180. What qualifies as an open field, however, is less clear. The Supreme Court has instructed that an open field "need be neither 'open' nor a 'field' as those terms are used in common speech." *Id.* at 180 n.11. The term includes "any unoccupied or undeveloped area outside of the curtilage." *Id.* Curtilage is "the area around the home to which the activity of home life extends," *id.* at 182 n.12, and while business premises too enjoy Fourth Amendment protections, *see See v. City of Seattle*, 387 U.S. 541, 543 (1967), we have not decided whether there is such a thing as "business curtilage." In *Dow Chemical*, the Supreme Court found an industrial plant complex with numerous plant structures spread over 2,000 acres to fall between open fields and curtilage, "but lacking some of the critical characteristics of both." 476 U.S. at 236. The Court ultimately held that the areas "are not analogous to the 'curtilage' of a dwelling for purposes of aerial surveillance." *Id.* at 239. More recently, this court noted that "[t]here may be circumstances in which the area adjoining a business structure is sufficiently private to

enjoy a protection analogous to a home's curtilage," but "it is clear that areas that adjoin a commercial building but are accessible to the public do not receive curtilage-like protection." *United States v. Elkins*, 300 F.3d 638, 653, 654 (6th Cir. 2002). In *Elkins*, police officers walked down a path next to a commercial building and peered through an opening in the building to see marijuana plants inside. *Id.* at 654. Despite a no trespassing sign on the building, we found the area on which the officers stood to be an "open field" because it was accessible to the public. *Id.*

*United States v. Rapanos* is also instructive. There the defendant, claiming a Fourth Amendment right to do so, barred state environmental inspectors from entering his 175-acre property to assess it for the presence of wetlands. 115 F.3d 367, 369 (6th Cir. 1997). The court held that the following factors had no bearing on whether the property was an open field: that the property was surrounded by a fence and a tall hedgerow of cleared debris, that entry onto the land could be made only through a locked gate, that the land had undergone "extensive alteration and development for one economic purpose or another and was clearly 'commercial property,'" and that the landowner was present. *Id.* at 373. Indeed, the "rather typical presence of fences, closed or locked gates, and 'No Trespassing' signs on an otherwise open field . . . has no constitutional import." *Id.* at 372; *see also Oliver*, 466 U.S. at 182 n.13 ("Certainly the Framers did not intend that the Fourth Amendment should shelter criminal activity wherever persons with criminal intent choose to erect barriers and post 'No Trespassing' signs."). We found that *Dow Chemical* undermined entirely the contention that the open fields doctrine could not apply to land that has been developed or prepared for development. *Rapanos*, 115 F.3d at 373. "Nor is the government's intrusion upon an open field a 'search' in the constitutional sense because that intrusion is a trespass at common law. The existence of a property right is but one element in determining whether expectations of privacy are legitimate." *Oliver*, 466 U.S. at 183; *see also Air Pollution Variance Bd. of Colo. v. W. Alfalfa Corp.*, 416 U.S. 861, 865 (1974) (finding a state health inspector "well within the 'open fields' exception," whether he was "within or without the premises," when he stood about two smokestack heights away from the base of the stack to inspect its smoke). Underpinning the analysis of these cases is the

Supreme Court's command in *Katz*: "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." 389 U.S. at 351.

The searches in this case did not violate the Fourth Amendment because Fillers has not shown that he had a legitimate expectation of privacy in the property. First, the magistrate judge correctly concluded that Fillers had not exhibited a subjective expectation of privacy. Fillers claims an interest in keeping possession of the demolition materials and excluding others from the site, but his actions undermine this contention. Fillers did not post any signs, erect a fence or other barrier, hire a security guard, or monitor the site to exclude others. On at least one side of the property, anyone could simply step from the sidewalk onto the site as he or she pleased. And indeed, members of the public walked across the site and picked through the debris. There was no evidence of ongoing business, and the only building on the property was partially demolished and unused. Fillers's argument that the site's demolition nature alone evidences his subjective expectation of privacy is unavailing. As the magistrate judge found, "[t]he evidence presented at the evidentiary hearing on defendants' motions to suppress is unequivocal that defendants took no actions whatsoever to maintain their privacy in the Watkins Street Property." The record fully supports this statement; Fillers did not try to keep the property private. Accordingly, Fillers has not met his burden of establishing a subjective expectation of privacy.

Second, even if Fillers had a subjective expectation of privacy, that expectation was unreasonable. The site qualifies as an open field. Though typically found in more rural areas, an open field need not be a "field." *See Oliver*, 466 U.S. at 180 n.11. On the date of the search, the site was unoccupied and undeveloped (as one might reasonably understand "undeveloped" in an urban setting), consisting of a partially demolished building and debris strewn throughout a paved lot. *See id.* (noting that the term "open field" includes "any unoccupied or undeveloped area outside of the curtilage"). As in *Dow Chemical* and *Elkins*, the property here is not sufficiently private to enjoy protection analogous to a dwelling's curtilage. *See Dow Chemical*, 476 U.S. at 236, 239;

*Elkins*, 300 F.3d at 653, 654.  Rather, it is easily accessible to the public.  And *Rapanos* teaches that the property's commercial status has no bearing on whether the property is an open field, despite Fillers's claim to the contrary.  *Rapanos*, 115 F.3d at 373.  The lower court did not err in finding the site an open field.

Futhermore, even if the property is not squarely an open field, any subjective expectation of privacy in it by Fillers would still be unreasonable.  As the Supreme Court has held, the government has "greater latitude to conduct warrantless inspections of commercial property" because "the expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's home."  *Donovan v. Dewey*, 452 U.S. 594, 598–99 (1981).  And most importantly, Fillers knowingly exposed the entire site to public access by not doing anything to exclude the public.  *See Katz*, 389 U.S. at 351.  *Allinder v. Ohio*, 808 F.2d 1180 (6th Cir. 1987), offered by Fillers without much analysis, does not counsel differently.  *See id.* at 1185 (noting that no case to date had used the open fields doctrine to justify "a search of personal effects or of a commercial structure in a field").  The property here was undeserving of Fourth Amendment protection; Fillers's objection to the warrantless searches therefore fails.

### 2.     *Warrantless Seizures*

Warrantless seizures presumptively violate the Fourth Amendment, but under certain circumstances an officer may seize evidence in plain view without a warrant. *Arizona v. Hicks*, 480 U.S. 321, 326–27 (1987).  Four factors must be satisfied:  (1) the item seized must be in plain view, (2) the item's incriminating character must be immediately apparent, (3) the officer must lawfully be in the place from where the item can be plainly seen, and (4) the officer must have a lawful right of access to the item. *Horton*, 496 U.S. at 136–37.  Because the magistrate judge and district court did not clearly err in finding that the seized pipe-wrap samples were lying on the site in plain view, and because Fillers had no legitimate expectation of privacy in the site, *supra*, Fillers is unable to convincingly challenge the first, third, and fourth prongs of the warrantless seizure test.

We consider four other factors, none necessary but each instructive, to assess the "immediately apparent" prong:  (1) the nexus between the seized item and the items particularized in the warrant, (2) whether the intrinsic nature or appearance of the item gives probable cause to believe it is associated with criminal activity, (3) whether the officers, at the time of discovery of the item and with the facts then available, can determine probable cause of the item's incriminating nature, and (4) whether the officer can recognize the incriminating nature of the item as the result of his instantaneous sensory perception.  *Garcia*, 496 F.3d at 510–11.  We have held that "when an item appears suspicious to an officer but further investigation is required to establish probable cause as to its association with criminal activity, the item is not immediately incriminating."  *United States v. McLevain*, 310 F.3d 434, 443 (6th Cir. 2002) (internal quotation marks omitted).  But probable cause does not require knowledge that evidence is contraband.  *Id.* at 441.  Instead, "probable cause is a flexible, common-sense standard.  It merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false."  *Texas v. Brown*, 460 U.S. 730, 742 (1983) (internal citations and quotation marks omitted).  In making the probable cause determination, we look at the collective knowledge of the government agents.  *United States v. Poulos*, 895 F.2d 1113, 1122 (6th Cir. 1990), *abrogated on other grounds by Horton v. California*, 496 U.S. 128 (1990).  Moreover, that an officer's initial impression was reinforced by subsequent investigation does not undermine the initial existence of probable cause.  *See United States v. Rodriguez*, 596 F.2d 169, 171, 175 (6th Cir. 1979) (subsequent chemical testing for heroin); *United States v. Byrd*, 211 F.3d 1270, at *3 (6th Cir. 2000) (unpublished table opinion) (subsequent confirmation that child in pornographic pictures was underage).

As the magistrate judge explained, John Schultz and Kathy Jones, the Bureau employees, had probable cause to believe that Fillers had not properly contained the asbestos when the buildings were demolished.  Both Schultz and Jones were trained to identify suspected asbestos-containing materials, and both knew that old

buildings—such as the partially demolished one remaining on the property—typically have asbestos wrap on pipes. Schultz and Jones saw pipe wrap material they recognized as likely to contain asbestos. And because Fillers and his company had applied to the Bureau for an asbestos removal permit, Schultz and Jones knew that the buildings on the property contained asbestos in the pipe wrap. In other words, the Bureau employees could immediately recognize the incriminating nature of the seized pipe-wrap samples, and they had probable cause to believe the items were associated with criminal activity. Further investigation later confirmed their beliefs, but probable cause was present before the seizure. *See Rodriguez*, 596 F.2d at 171, 175. Accordingly, the plain view doctrine permitted Schultz and Jones to seize the pipe-wrap samples without a warrant. Fillers's argument that the government may not use the *open fields doctrine* to justify the seizure of property is misplaced, since the seizure is justified by the *plain view doctrine*.

We affirm the district court's denial of Fillers's motion to suppress.

### B.     Trial Testimony on Alleged Health Effects and Daycare Facility

Fillers challenges testimony about asbestos's negative health effects, and both Mathis and Fillers challenge testimony revealing the presence of a daycare facility near the site.

### 1.     *Alleged Health Effects Testimony*

Fillers contends that evidence of asbestos's negative health effects should have been excluded as irrelevant and unfairly prejudicial under Federal Rules of Evidence 402 and 403. He challenges statements made by three of the government's twenty-three witnesses. *See* Test. Pamela McIlvaine[1]; Test. Richard Jardine[2]; Test. Peggy Jean

---

[1] Q: Are you familiar with a term called air sampling? What is that?

A: At a lot of work sites they set up air sampling. In a lot of ways that mitigates concerns of the public, if they can show that air levels are at a certain level. Under the asbestos NESHAP, the sampling that they talk about for the thorough sample inspection is bulk sampling, it's not air sampling. There's not a safe level of asbestos exposure that's been established. So there's no provisions under the asbestos NESHAP that says if you have air sampling that shows asbestos in the air below a certain level that that's okay. There isn't a safe level.

. . .

Forney.**3** Fillers did not object when this testimony was introduced, so we review its admission for plain error. *United States v. Kelly*, 204 F.3d 652, 655 (6th Cir. 2000).

It was not plain error for the district court to permit these passing comments. First, the statements arguably were relevant. McIlvaine's and Jardine's testimony helped the jury understand part of the purpose of the asbestos regulations and work-practice standards, and Forney's testimony helped establish her credibility as the expert chemist who confirmed that the samples contained asbestos. Second, the statements were not unfairly prejudicial, given the likelihood that the jurors already knew that asbestos is dangerous. And regardless, the district court was not clearly required to find that any such danger of unfair prejudice substantially outweighed the probative value of this testimony. Finally, any error in permitting this evidence was harmless because Fillers has not shown that this testimony, in light of the other evidence, had a substantial or

---

Q: Please explain to the jury what asbestos is, generally.

A: Asbestos is a naturally occurring mineral, and the microscopic fibers are very, very small, much smaller than a hair. You cannot see an individual fiber. And the reason that asbestos fibers pose health concerns is, they're so small, and they're very long compared to how wide they are, so the filtering mechanisms of your nose and your mouth won't filter out asbestos particles like it will filter out general -- other dust and particulate particles. So these particles will get past your nose and your mouth, and they'll penetrate into your alveolae of your lungs, where the microphages in your system can't get rid of them. They will try to absorb them, and actually form scar tissue around those fibers. And asbestosis -- I mean, asbestos exposure has been associated with asbestosis, lung cancer, and mesothelioma.

**2**Q: With regard to -- You mentioned the asbestos worker training course. What did you learn in that course in your training?

A: Well, we learned a number of things, specifically how to go about doing an asbestos abatement. There are specific techniques that you're supposed to employ when you do that. Also we learned the hazards associated with asbestos, how it actually -- a single fiber can enter the alveola and very fine reaches of your lung air passageway, and it causes severe irritation and quite a lot of distress. It can ultimately -- as one of my friends contracted mesothelioma, it can cause death.

**3**Q: How does a fume hood work?

A: It's -- a fume hood is a box that is in front of me. There's a filter in the back. The airflow comes in front of my face, across the microscopes, and into the filter, so that I am protecting myself, any fibers go back into the filter instead of front, towards me.

Q: And why are those precautions taken?

A: I do not want to breathe asbestos fibers. I would like to live to an old age without health problems.

injurious effect or influence on the jury's verdict.  *See Fry v. Pliler*, 551 U.S. 112, 116 (2007).

### 2.     *Daycare Facility Testimony*

Both Mathis and Fillers argue that the district court erred when it denied their motion at trial to exclude testimony revealing the presence of a daycare center next to the site.  They challenge the testimony of Bettye Spratling, who worked at the center, as irrelevant, unfairly prejudicial, and needlessly cumulative.  We review the district court's evidentiary ruling for an abuse of discretion.  *United States v. Blackwell*, 459 F.3d 739, 752 (6th Cir. 2006).

The district court did not abuse its discretion when it permitted Spratling to testify that she worked at a daycare facility next to the site, saw men throwing materials into the back of a truck, and had to bring the center's children inside because of dust from the demolition activities.  At trial, Fillers's counsel conceded that Spratling's observations would be relevant.  That Spratling worked at the daycare center was arguably relevant to the jury's understanding of the location from which she made her observations and her response to the dust.  Moreover, the jury had already heard about the existence of the daycare center and the dust—in testimony Mathis and Fillers did not challenge—rendering Spratling's testimony on the same not unfairly prejudicial. Finally, Spratling's testimony was not needlessly cumulative because it reinforced and corroborated the testimony of other witnesses regarding the dust and handling of asbestos at the site.  *See Stapleton v. Wolfe*, 288 F.3d 863, 868 (6th Cir. 2002).  We do not hold a "definite and firm conviction" that the district court committed a clear error of judgment when it weighed the relevant factors and admitted Spratling's testimony. *See United States v. Schreane*, 331 F.3d 548, 564 (6th Cir. 2003).  And, like the alleged health effects testimony, any error in permitting this evidence was harmless.  *See Fry*, 551 U.S. at 116.

We therefore affirm the district court's admission of the health effects and daycare facility testimony.

### C.    Sufficient Evidence for Convictions

Both Mathis and Fillers challenge the sufficiency of the evidence supporting all counts of their convictions.  We review sufficiency of the evidence challenges de novo to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  We review the denial of a Rule 29 motion based on sufficiency of the evidence under the same standard.  *See United States v. Clay*, 667 F.3d 689, 693 (6th Cir. 2012).  "In making this determination, however, we may not reweigh the evidence, reevaluate the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005).

#### 1.    Mathis

*Conspiracy*.  The jury convicted Mathis of conspiracy, in violation of 18 U.S.C. § 371.  To establish conspiracy, the government must prove the existence of an agreement to act together in committing an offense and an overt act in furtherance of the conspiracy. *United States v. Milligan*, 17 F.3d 177, 182 (6th Cir. 1994).  The agreement may be tacit, rather than explicit, and it may be inferred from circumstantial evidence. *United States v. Deitz*, 577 F.3d 672, 677 (6th Cir. 2009).  "A defendant may be guilty of conspiracy despite possessing limited knowledge of the conspiracy's scope, details and membership," though he must know the purpose of the conspiracy. *Milligan*, 17 F.3d at 183.

Mathis's conviction rested on two theories.  First, the government alleged that Mathis conspired to defraud the United States by agreeing with Fillers to file the false 10-day notice, which vastly understated the amount of asbestos at the site. Mathis acted in furtherance of the conspiracy, the government claimed, by actually filing the notice with estimates Mathis knew were false.  Second, the government alleged that Mathis conspired with Fillers and others to violate the Clean Air Act, acting in furtherance of the conspiracy by directing his workers to start demolition before all asbestos had been safely removed.

Sufficient evidence ultimately supports both theories. In response to the first, Mathis contends that he used the Alternative Actions survey to complete other parts of the 10-day notice but left the asbestos estimate entry blank, and that Fillers or Herbert Warden later provided the incorrect numbers to Jones. The government's brief counters that Jones testified that Mathis gave her the false estimates and "remained convinced" of this fact on cross-examination, but this characterization of Jones's testimony is inaccurate. As the government conceded at oral argument, Jones was never positive that Mathis gave her the false estimates. Most damning to the government's case, Jones stated on cross examination that "what I've tried to say all morning . . . is that I am not sure who gave me those first set of numbers . . . ." Thus, a rational juror could not rely on Jones's testimony to prove beyond a reasonable doubt that Mathis gave her the false estimates.

Nevertheless, the jury had sufficient circumstantial evidence to conclude that Mathis either provided or purposely omitted the numbers, thus implicating him in the conspiracy. Mathis admitted that he signed the notice, certifying that the information provided was "true and complete" to the best of his knowledge. He told an EPA criminal investigator that he used the Alternative Actions survey, which contained the amounts and locations of asbestos at the entire site, "to assist him in completing" the notice. Moreover, a juror could use Mathis's later statements and actions, discussed below, as further evidence that he agreed to mislead the government with the notice. And though the indictment specifically charged Mathis with providing the false numbers to Jones, any variance resulting from reliance on this omission theory did not affect a substantial right of Mathis. *See United States v. Beasley*, 583 F.3d 384, 392 (6th Cir. 2009) ("[S]ubstantial rights of the defendant are affected only when the defendant shows prejudice to his ability to defend himself at trial, to the general fairness of the trial, or to the indictment's sufficiency to bar subsequent prosecutions." (internal quotation marks omitted)). A rational juror could infer beyond a reasonable doubt that Mathis, in an attempt to mislead the government, either deliberately falsified the numbers in the notice or deliberately left that section of the form blank.

In response to the second theory, Mathis claims that he did not conspire to violate the Clean Air Act because he believed ADC had removed all of the asbestos at the site, and that it was safe to begin demolition. At trial, however, Warden testified that he repeatedly told Mathis that there was asbestos "all over the ground" during the period Mathis's workers were demolishing the plant. Mathis did not alert the Bureau to this fact or delay demolition. From this testimony, a rational juror could have found that Mathis agreed with Fillers, albeit perhaps reluctantly, to oversee a demolition process that violated the EPA's asbestos-removal regulations. Mathis's conspiracy conviction thus must stand.

*Clean Air Act Violations*. Mathis challenges his convictions under 42 U.S.C. § 7413(c)(1), which criminalizes the knowing violation of the EPA's work-practice standards. The jury convicted Mathis of failing to file an accurate 10-day notice and of starting demolition before all asbestos had been removed. *See* 40 C.F.R. § 61.145(b), (c)(1). As discussed above, sufficient evidence exists to support Mathis's conviction for failing to file an accurate notice. The jury also had ample evidence to conclude that Mathis knowingly violated the removal requirement. For example, Warden testified that he told Mathis about asbestos-containing materials scattered throughout the property that ADC was not hired to abate. Mathis replied that he "was tired of arguing with [Fillers], that [Fillers] was not paying for no more asbestos removal." A rational juror could infer that Mathis knew asbestos was present when he began demolition. Accordingly this conviction must also stand.

*Rule 29 Arguments*. Mathis separately challenges the district court's denial of his motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29, arguing that sufficient evidence did not support the conspiracy count. We review the denial of a Rule 29 motion based on sufficiency of the evidence under the same standard we apply to a challenge to the sufficiency of the evidence on appeal. *See Clay*, 667 F.3d at 693. Thus, for the reasons described above, the district court did not err in denying Mathis's Rule 29 motion.

Mathis also argues that the district court improperly took his Rule 29 motion under advisement when he first presented it at the close of the government's case. But Federal Rule of Criminal Procedure 29(b) expressly allows a district court to "reserve decision" on a Rule 29 motion "where the motion is made before the close of all the evidence"—precisely what the district court did here. Mathis's Rule 29 arguments are therefore without merit.

Accordingly, we find that sufficient evidence supports all of Mathis's convictions.

### 2.    *Fillers*

*Conspiracy.* Like Mathis, Fillers was convicted of conspiracy. Fillers argues that there was insufficient evidence that a conspiracy existed and that he knowingly joined it. Moreover, he contends, the district court erred by relying on his demolition contract with Mathis as sufficient proof of an agreement to violate the law. Fillers also claims that he was unaware of any Clean Air Act work-practice violations and that Halbert Warden's testimony implicating him should be rejected because it contradicted Jones's testimony.

Fillers's arguments are unavailing. First, ample evidence exists, beyond his contract with Mathis, that Fillers knowingly acted with others to unlawfully remove asbestos from the site. At trial Fillers's brother Gary testified that Fillers was the head of Watkins Street Project. Warden, the abatement company manager, testified that Gary told him Fillers "wanted no more asbestos taken out" and that Mathis told him Fillers "was not paying for no more asbestos removal." When Warden complained to Fillers that others were improperly removing asbestos-containing material, Fillers told him "it was none of [his] business." And Fillers removed asbestos warning signs, telling Warden "it was drawing attention and he did not want these up." Second, the government need not prove that Fillers knew he was violating the Clean Air Act, just that he knew the materials contained asbestos and that his actions released asbestos into the environment. *See United States v. Buckley*, 934 F.2d 84, 88 (6th Cir. 1991). The government produced sufficient evidence to support these points. Finally, that Warden's

testimony was inconsistent with Jones's testimony on a few issues—none essential to the government's case—did not require the jury to reject either Warden's or Jones's testimony in whole. *See United States v. Bazazpour*, 690 F.3d 796, 803 (6th Cir. 2012) ("[A] jury may properly accept or reject testimony in whole or in part." (internal quotation marks omitted)). A rational juror could have inferred beyond a reasonable doubt the existence of a conspiracy, which Fillers willingly joined, to remove asbestos from the site illegally.

*Clean Air Act Violations*. The jury convicted Fillers of failing to file an accurate 10-day notice, starting demolition before all asbestos had been removed, failing to have present during demolition an individual trained in the work-practice standards, and mishandling asbestos in various ways. *See* 40 C.F.R. §§ 61.145(b) (notice requirement), (c)(1) (removal requirement), (c)(2)–(6) (wetting and lowering requirements), (c)(8) (trained individual requirement), 61.150 (disposal requirements).

Ample evidence exists again to support Fillers's convictions. First, for reasons discussed below, a rational juror could have found that Fillers knew the 10-day notice contained a false estimate of asbestos. Second, there was substantial evidence to infer that Fillers knew unabated asbestos remained on the site after demolition began. Fillers possessed a copy of the Alternative Actions survey, which showed that the site contained a substantially higher amount of asbestos than the amount ADC was hired to abate. And Warden testified that Fillers hired him to abate only the asbestos in the boiler room and around two additional pipes, despite Warden's telling Fillers that other asbestos existed outside of the boiler room. Third, Warden was not present when the other asbestos material was removed, and Fillers has not argued that any other trained individual was present during this removal. Finally, a number of witnesses testified that workers on the site did not properly wet or otherwise handle asbestos materials. Fillers was at the site every day during the demolition; a rational juror could infer beyond a reasonable doubt that he knew of the improper handling. Simply put, sufficient evidence supported Fillers's convictions on the substantive Clean Air Act counts.

*False Statement.*  The jury also convicted Fillers of making a false statement, in violation of 18 U.S.C. § 1001(a)(2), when he gave an allegedly false asbestos estimate to Kathy Jones, the Bureau employee.  Fillers's primary challenge to this conviction is that he did not know the estimate, which was based on the limited ADC survey, was false.  But circumstantial evidence indicates that Fillers knew the contents of the comprehensive Alternative Actions survey and, therefore, that using the ADC survey would greatly understate the amount of asbestos present on the site.  Fillers was present at the initial walkthrough for the Alternative Actions survey.  The survey was delivered to Fillers's brother and business partner Gary, and the Watkins Street Project operating agreement required Fillers, as the company's "chief manager," to "supervise and direct generally all of the business affairs of the [c]ompany."  And depending on who was asking for it, Fillers provided the survey in whole, in part, or not at all, or denied its existence.  From these facts, a rational juror could conclude beyond a reasonable doubt that Fillers knew the contents of the Alternative Actions survey, and thus that he made a false statement when he told Kathy Jones the site contained much less asbestos than estimated in the survey.

*Obstruction of Justice.*  Fillers challenges his conviction under 18 U.S.C. § 1519, which prohibits the knowing alteration, destruction, concealment, or falsification of any document with the intent to impede, obstruct, or influence a federal investigation or matter.  The government alleged that Fillers obstructed justice when he knowingly gave Schultz an incomplete version of the Alternative Actions survey, from which he had removed several pages listing significant quantities of asbestos-containing material, to impede a potential investigation.  Fillers contends that he did not know the version was missing pages and that, at any rate, Schultz's investigation was not impeded.

The evidence from trial is sufficient under the *Jackson* standard to sustain Fillers's conviction on this count.  Schultz's copy of the Alternative Actions survey indicated that he had received it from Fillers. While Schultz initially testified that he had received all five pages of a spreadsheet contained in the survey, on cross and redirect—after reviewing his incident report—Schultz stated and remained convinced

that he did not receive two of the five spreadsheet pages from Fillers. Those pages contained locations and quantities of asbestos-containing materials on the site. Moreover, Fillers had provided incomplete copies of the survey, and even denied its existence, at other times. From these facts, a rational juror could find beyond a reasonable doubt that Fillers intended to provide an incomplete version of the survey in order to impede Schultz's impending investigation.

We therefore find that sufficient evidence supports all of Fillers's convictions.

**D.     Sentencing Guidelines Range**

Mathis and Fillers challenge the district court's application of two enhancements: a six-level adjustment under U.S.S.G. § 2Q1.2(b)(1)(A) for engaging in an "ongoing continuous, or repetitive discharge, release, or emission of a hazardous or toxic substance or pesticide into the environment," and a nine-level adjustment under § 2Q1.2(b)(2) for conduct "result[ing] in a substantial likelihood of death or serious bodily injury." We review the district court's legal interpretation of the sentencing guidelines de novo and its factual conclusions for clear error. *United States v. Poulsen*, 655 F.3d 492, 505 (6th Cir. 2011). A factual conclusion is clearly erroneous only if, "although there may be some evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Darwich*, 337 F.3d 645, 663 (6th Cir. 2003). The district court must find by a preponderance of the evidence that the enhancement applies. *Poulsen*, 655 F.3d at 505.

*1.     Ongoing, Continuous, or Repetitive Release of a Hazardous Substance*

Mathis and Fillers contest the district court's application of U.S.S.G. § 2Q1.2(b)(1)(A). That guideline requires a six-level enhancement if "the offense resulted in an ongoing, continuous, or repetitive discharge, release, or emission of a hazardous or toxic substance . . . into the environment." To trigger the provision, the government must show that some amount of hazardous or toxic substance contaminated

the environment, but it need not show actual harm to the environment. *See United States v. Bogas*, 920 F.2d 363, 368–69 (6th Cir. 1990) (interpreting U.S.S.G. § 2Q1.2 cmt. n.5); *see also United States v. Shurelds*, 173 F.3d 430, at *5 (6th Cir. 1999) (per curiam) (unpublished table opinion) (upholding application of enhancement where "evidence indicates that asbestos made its way outside of the containment area"). Moreover, we agree with the Ninth Circuit that direct evidence of a substance's release into the environment is not necessary; rather, "in most cases reasonable inferences from available evidence will suffice to support a conclusion that illegal acts resulted in contamination." *United States v. Technic Servs., Inc.*, 314 F.3d 1031, 1047 (9th Cir. 2002), *overruled on other grounds by United States v. Contreras*, 593 F.3d 1135 (9th Cir. 2010).

Mathis and Fillers attack the district court's factual conclusions, arguing that the evidence did not sufficiently show that asbestos was released into the environment. We disagree. The Alternative Actions survey indicated that the site contained far more asbestos than ADC was hired to abate. Multiple witnesses testified that they saw workers remove—or that they personally removed—material likely containing asbestos without wetting it, instead "dump[ing] it out of the back side of the building" and collecting it into trucks for removal. And materials lying on the ground at the site tested positive for asbestos after demolition had occurred. To support its findings, the district court did not rely on the mere presence of dust, which Mathis and Fillers claim was not shown to contain asbestos. Nor do the tests showing that the air did not contain asbestos—none conducted at the same time as the improper removal of asbestos—require us to reverse the district court's findings. We are not left with the definite and firm conviction that the court made a mistake in concluding that asbestos had been released into the environment. Its factual findings were therefore not clearly erroneous, and its application of the § 2Q1.2(b)(1)(A) enhancement was proper.

### 2.     *Substantial Likelihood of Death or Serious Bodily Injury*

Mathis and Fillers also disagree with the district court's application of U.S.S.G. § 2Q1.2(b)(2). That guideline requires a nine-level enhancement if "the offense resulted in a substantial likelihood of death or serious bodily injury." The district court applied

this enhancement after hearing days of testimony and argument about the potential health effects of asbestos exposure on the site's salvage and demolition workers, and it explained its application in a thorough memorandum. Mathis and Fillers contest the court's legal and factual conclusions.

Citing *Lindstrom v. A-C Product Liability Trust*, 424 F.3d 488 (6th Cir. 2005), the defendants argue that a court should not apply § 2Q1.2(b)(2) unless it finds that someone suffered substantial exposure to a hazardous material for a substantial period of time. But *Lindstrom*—a products liability case—explained how a plaintiff could show that a product was a *substantial factor in causing an injury*, not how one could show that conduct *caused a substantial likelihood of an injury*. *See id.* at 492. As the district court properly recognized, the two inquiries are distinct. Much more on point is *United States v. Thorn*, 317 F.3d 107 (2d Cir. 2003), *aff'd*, 446 F.3d 378, 383 (2006). We agree with the Second Circuit's reasoning: a district court should apply the § 2Q1.2(b)(2) enhancement if the defendant's offense made it considerably more likely that a person would die or develop a serious bodily injury. *See id.* at 117. Actual death or serious bodily injury need not occur to apply the enhancement. *Id.* Moreover, the district court correctly found that a defendant's conviction for violating a work-practice standard does not automatically trigger § 2Q1.2(b)(2), though such violations may be relevant to determining the likelihood of death or serious injury.

Mathis and Fillers further contend that the district court clearly erred in finding that any exposure to asbestos, no matter how small, is unsafe. They also believe that the evidence did not sufficiently show that workers were even exposed to asbestos. But once again, the record does not leave us with the definite and firm conviction that the district court made a mistake in its findings of fact. The court found that "no exposure to asbestos is proven safe" and "any exposure to asbestos is potentially hazardous," that "workers were necessarily exposed to asbestos fibers released by" their improper removal procedures, and that "members of the salvage crew were not only exposed to asbestos fibers, but inhaled them." Evidence put forth at trial and the sentencing hearing supports each of these conclusions. Moreover, the court thoughtfully considered and

weighed the testimony from the parties' experts, finding the government's toxicologist more persuasive.  Though Mathis and Fillers strongly dispute that expert's conclusions, we see no clear error in the court's assessment.  *See United States v. Yi*, 704 F.3d 800, 806–07 (9th Cir. 2013) (finding no clear error where the district court "both considered and permissibly gave little or no weight to the defense expert's opinion" regarding the potential harm of asbestos exposure).   The district court properly applied the § 2Q1.2(b)(2) enhancement.

> 3.    *Minimal or Minor Role, and Alleged Enhancement for Acting Without or in Violation of a Required Permit*

Mathis separately argues that he deserved a reduction in his guidelines range because he was a "minimal" or "minor participant in the criminal activity." *See* U.S.S.G. § 3B1.2.  A minimal participant is "plainly among the least culpable of those involved in the" criminal activity, and a minor participant is "less culpable than most other participants, but [one] whose role could not be described as minimal." *Id.* cmt. nn. 4, 5. Mathis bore the burden of proving by a preponderance of the evidence that he was entitled to such a mitigating-role reduction. *United States v. Salgado*, 250 F.3d 438, 458 (6th Cir. 2001).  He did not meet that burden here.  At the very least, Mathis directed day after day of demolition knowing the site still contained asbestos, and he signed the false 10-day notice that misled the Bureau.  It was not clearly erroneous for the district court to deny Mathis a mitigating-role reduction.

Mathis raises a final challenge to his sentence by claiming that "the trial court appears to have applied" a 2-level enhancement under § 2Q1.2(b)(4) for the "transportation, treatment, storage, or disposal [of a hazardous substance] without a permit or in violation of a permit."  But the district court did not actually apply this enhancement.  Mathis's PSR recommended not applying the enhancement, and the government objected.   At sentencing, after argument on the subject, the court unequivocally denied the objection.  Mathis does not argue that his sentence was improperly calculated or that the district court applied the enhancement despite its intention not to do so.  This argument is therefore without merit.

### III.  CONCLUSION

We affirm the district court's denial of Fillers's motion to suppress the asbestos-containing samples, the district court's admission of the challenged health effects and daycare facility testimony, Fillers's and Mathis's convictions, and the district court's sentencing decisions.