*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0422p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

    *Plaintiff-Appellee,*

    *v.*

FREDERICK ALONZO WALLER,

    *Defendant-Appellant.*

No. 04-5204

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 02-00171—Robert L. Echols, Chief District Judge.

Argued: April 26, 2005

Decided and Filed: October 24, 2005

Before: KEITH, CLAY, and FARRIS, Circuit Judges.[*]

---

## COUNSEL

**ARGUED:** Michael C. Holley, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Philip H. Wehby, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee. **ON BRIEF:** Michael C. Holley, Ronald C. Small, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Philip H. Wehby, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

---

## OPINION

---

KEITH, Circuit Judge. The Defendant-Appellant, Frederick Alonzo Waller ("Waller"), appeals his conviction for knowingly possessing a firearm after having been convicted of three violent felonies in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) and (3). On appeal, Waller argues that the district court erred by failing to suppress the weapons at issue because they were discovered pursuant to an unconstitutional search of his luggage. Waller also contends that the district court improperly admitted prior bad acts evidence during his jury trial and failed to instruct the jury accurately on how to consider that evidence. Lastly, Waller asserts that his sentencing violated his constitutional rights because the district court believed that the federal sentencing guidelines were mandatory at the time of sentencing and because the district court, rather than a jury, made the factual finding that he had previous convictions. For the

---

[*] The Honorable Jerome Farris, Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

1

reasons set forth below, we **REVERSE** Waller's conviction, **VACATE** his sentence, and **REMAND** this case for further proceedings in the district court.

## I. BACKGROUND

In December 2001, Waller, a convicted felon, moved into the residence of Carlton Storey ("Carlton"), an individual whom Waller had previously met while both men were in prison. The home in which Waller and Carlton Storey began residing was actually owned by Carlton Storey's grandmother, Olivia Storey ("Olivia"). Approximately six months later, Olivia's daughter, Cynthia Green ("Green"), moved into the same residence. Although Olivia did not object to Waller residing in her home, Green objected to Waller's presence there because she believed that he was participating in illegal drug activity. On June 13, 2002, approximately three weeks after Green moved into her mother's home, she observed Waller handling two pistols, first in the house and later at his car. According to Green, Waller placed a black firearm in his pants pocket and a silver firearm inside the waistband of his pants. Later that day, Green asked Waller to move out of her mother's residence and an argument ensued. Green telephoned the police.

When the police arrived, Waller, Green, Carlton, and Olivia were all present outside the home. At the time, Green did not tell the police that Waller possessed any firearms. In the presence of the responding officers, however, Olivia permitted Waller to reside at her home for an additional two weeks. Having been given the impression that the situation was under control, the officers left the scene without incident.

After the officers departed, Green asserts that she and Waller continued to argue. Green alleges that during the argument Waller verbally threatened her and raised his shirt to reveal the handle of the silver firearm that he had earlier placed inside the waistband of his pants. Carlton and Olivia both attested that Waller had threatened Green, and both recalled Waller pulling back his shirt. Carlton and Olivia, however, stated that Waller took these actions before (not after) the police responded to the scene, and neither of them could recall observing a gun in the waistband of Waller's pants. Carlton, however, saw something of a yellowish or greenish color at Waller's waist, which he later acknowledged was close in color to the color of a .45 caliber clip that was later found by police. Waller claims he left the Storey residence after the police departed.

Green then went to the police station and swore out a warrant on Waller attesting that Waller threatened her while possessing firearms. The police arrested Waller the following day, but he was released on bond on the condition that, among other things, he not return to the Storey residence. Three days thereafter, in violation of the condition of his bond, Waller briefly returned to the Storey home. After Green reported this violation to the authorities, another warrant was issued for Waller's arrest.

Unable to reside at the Storey home, Waller asked his friend, Riley Howard ("Howard"), if he could store his personal belongings in Howard's one-bedroom apartment, which Howard shared with his live-in girlfriend, Jacqueline Frazier ("Frazier"). Howard assented to Waller's request for assistance, and Waller stored a brown luggage bag, a few garbage bags of clothing, and some food at Howard's home. Apparently Waller stored most of his belongings in either the living room, bedroom or bathroom closets. Waller also ate, showered, and changed clothes at Howard's apartment. Waller, however, did not sleep in the apartment. Neither Howard nor Frazier knew what Waller had stored in the apartment closets, and neither looked inside his luggage bag or his other plastic garbage bags.

On June 21, 2002, Detective Michael Eby ("Eby") of the Metro Nashville Police Department went to Howard's apartment complex to serve the warrant arising from Green's latter complaint on Waller. Upon arriving at the location, Eby recognized Waller's vehicle, a green Cadillac with a damaged driver's side, in the complex parking lot. Eby then encountered Waller walking toward the parking lot and arrested him. After arresting Waller, Eby asked him "which apartment did you come from," to which Waller responded "apartment 6," which is Howard's apartment number. Joint Appendix ("J.A.") at 483. Once Waller was

secured in the police car with other officers, Eby and Officer Joe Helmintoller ("Helmintoller") then proceeded to apartment 6 and spoke with Howard, who informed them that Waller had just been there. J.A. at 484. While speaking to Eby and Helmintoller, Howard stated that Waller had been keeping some property at his apartment. *Id.* Present in the apartment at the time were Howard, Frazier, and Sandra Pettigrew. Initially, the officers secured Howard's verbal consent to search the apartment. Immediately thereafter, Howard executed a written consent form to search the apartment. In particular, the officers admitted that they initially were searching for a woman named, Shatika Ball, on the basis of a report that Waller had kidnaped Ball. Once the officers confirmed that Ball was not present in the residence they began searching for personal items that Waller might have stored in the apartment.

Officer Helmintoller then located a brown luggage bag in the bedroom closet. The luggage bag was zipped closed. Officer Helmintoller opened it, finding two firearms. He then showed the luggage bag and the weapons to Detective Eby, who was present in the bedroom. Detective Eby then inquired of the apartment occupants whether the brown luggage bag or the weapons belonged to any of them, but all of the occupants denied ownership.

On October 9, 2002, the government charged Waller with a single count of being a felon in possession of firearms in violation of 18 U.S.C. §§ 922(g)(1) and 924. On February 10, 2003, Waller filed a motion in the district court to suppress the firearms recovered by police during the search of his luggage bag. Waller argued the search was unlawfully conducted and unreasonable under the Fourth Amendment. On March 7, 2003, the district court rejected Waller's request to suppress the firearms, concluding that he did not have standing to challenge the search of the apartment and, in any event, Howard had properly consented to the search. Waller also filed a motion in limine to preclude the introduction of prior bad acts evidence during trial. Again, the district court denied his request.

Waller's case then proceeded to trial, and on March 13, 2003, the jury returned a verdict finding him guilty. Waller subsequently filed motions for a new trial and for a judgment of acquittal, both of which the district court denied. On November 25, 2003, the district court entered judgment against Waller and imposed a sentence of imprisonment for a term of 264 months. On the same day, Waller filed a notice initiating this appeal.

## II. SUPPRESSION OF THE FIREARMS

In his first assignment of error, Waller asserts that the district court erred in denying his motion to suppress evidence by holding that (1) he lacked standing to challenge the search, and (2) the consent given by Howard sufficiently authorized the officers to search the brown luggage bag. The government responds that the district court properly denied Waller's motion because Waller was merely a social guest or casual visitor without any standing to challenge the search, and the officers had actual and apparent authority to search the entire premises, including Waller's luggage bag.

### A. Standard of Review

In assessing a challenge to the district court's ruling on a motion to suppress, we review the district court's factual findings for clear error, and its legal conclusions *de novo. United States v. Crozier*, 259 F.3d 503, 510 (6th Cir. 2001).

### B. Discussion

The district court cited alternative grounds for denying Waller's request for suppression of the weapons recovered during the search of his luggage on June 21, 2002. Initially, the district court determined that Waller lacked standing to challenge the search. In the alternative, the district court held that the officers had actual authority to search the entire premises, including inside Waller's luggage. Waller challenges both of these findings. He claims that even if he did not have standing to challenge the general premises search, he nonetheless retained standing to challenge the search of his opaque, closed luggage.

The Fourth Amendment provides, in relevant part, that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. art. IV. Here, the parties do not dispute that a piece of luggage is an item that can be protected from unreasonable searches under the Constitution. Rather, they contest whether under the facts of this case Waller retained a sufficient expectation of privacy in the luggage that he placed in Howard's bedroom closet. This circuit has previously said that "[b]ecause Fourth Amendment rights are 'personal,' the central inquiry in any suppression hearing is whether the defendant challenging the admission of evidence has shown a legitimate expectation of privacy in the place searched or the thing seized." *United States v. King*, 227 F.3d 732, 743 (6th Cir. 2000) (quoting *Rakas v. Illinois*, 439 U.S. 128, 140 (1978) and citing *Katz v. United States*, 389 U.S. 347, 353 (1967)).[1] We employ a two-part inquiry for determining whether a legitimate expectation of privacy exists: "'First, we ask whether the individual, by conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he sought to preserve something as private. . . . Second, we inquire whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable.'" *King*, 227 F.3d at 743 (quoting *Bond v. United States*, 529 U.S. 334, 338 (2000)). We determine whether a legitimate expectation of privacy exists in a particular place or thing on a "case-by-case basis." *King*, 227 F.3d at 744. In making this determination, we consider "the person's proprietary or possessory interest in the place to be searched or item to be seized[;]" "whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises." *Id*.

### i.     Waller's Legitimate Expectation of Privacy

In the present case, we conclude that Waller had a legitimate expectation of privacy in his luggage bag. Therefore, he could constitutionally contest the search of his bag. Waller has shown by his conduct that he sought to preserve the contents of his luggage bag as private. Waller did not inform Howard or Frazier, the residents of the apartment, of the contents of his bag. Neither did he give either of them the authority to look inside the bag. Each of them testified that they did not open his luggage because they believed it contained his personal effects. Moreover, the district court found that Waller left the bag zipped, closed, and stored in the bedroom closet of the apartment. Considering all of the relevant circumstances, we hold that Waller exhibited an actual expectation of privacy.

### ii.     Reasonableness of Waller's Legitimate Expectation of Privacy

Second, this court must inquire whether Waller's expectation of privacy is one that society is prepared to recognize as reasonable. The Supreme Court determined in *Bond* that under the Fourth Amendment a bus traveler has a reasonable expectation that his carry-on luggage would not be subject to invasive exploration by governmental officials. 529 U.S. at 335-38. The same reasonableness justifies Waller's expectation of privacy in this case. Waller had recently moved his things from the Storey residence, but had not taken up residence in Howard's apartment. Waller was transient, using Howard's apartment primarily for showering, changing clothes, and storing his personal belongings. He placed some of his personal items in a piece of luggage, zipped the luggage closed, and stored it in the bedroom closet of the apartment. Under these circumstances, Waller's expectation that his luggage would not be subject to "[p]hysically invasive inspection" was reasonable. *Id*. at 337. Moreover, the government does not argue that society would find such an expectation of privacy to be unreasonable. Inasmuch as Waller exhibited an actual expectation of privacy that society is prepared to recognize as reasonable under the

---

[1] Although the district court and the parties discuss whether Waller had a legitimate expectation of privacy as an issue of "standing," the Supreme Court expressly rejected using a standing analysis in *Rakas*, 439 U.S. at 139-140. *See also Minnesota v. Carter*, 525 U.S. 83, 87 (1998). Instead, the Court has "held that in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable[.]" *Id*. at 88.

Fourth Amendment, the district court erred in finding that Waller did not have authority to challenge the search of his luggage.

### iii.    Common Authority

In addition to concluding that Waller did not have the requisite legitimate expectation of privacy to challenge the search, the district court alternatively held that the officers had actual authority to search the luggage bag because Howard consented to the search of his apartment both orally and in writing. J.A. at 511 ("[T]he owner of the apartment had full right in this case and under these circumstances to grant consent for the police to search[.]"). Howard, of course, did not own the luggage at issue. Nevertheless, in *United States v. Matlock*, 415 U.S. 164, 171-72 (1974), the Supreme Court held that when the government seeks to justify a warrantless search by proof of voluntary consent, in the absence of proof that consent was given by the defendant, it "may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." In describing what constitutes common authority, the Supreme Court explained that "[c]ommon authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property[.]" *Id*. at 171, n.7. Rather, the Court said, common authority rests "on *mutual use* of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id*. (emphasis added). On this basis, a resident's consent to search his home is not necessarily consent to search a closed object within the home. *See United States v. Karo*, 468 U.S. 705, 725-26 (1984) (O'Connor, J., concurring) ("A homeowner's consent to a search of the home may not be effective consent to a search of a closed object inside the home."). *See also United States v. Rodriguez*, 888 F.2d 519, 524 (7th Cir. 1989) ("[T]he United States has not cited a single case approving a search of a closed container in consequence of a general consent to enter the room in which it was found.").

In this case, Howard's consent to search his apartment does not necessarily extend to Waller's closed luggage. A valid consent to search the closed container must come from one who has common authority over the effects sought to be inspected, one who has mutual use of the property, and one who generally has joint access or control for most purposes. *Karo*, 468 U.S. at 725-26. The government bears the burden of establishing the effectiveness of a third party's consent. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). In this case, it is obvious that Howard, who assented to the search of his apartment in general, did not have common authority specifically with regard to Waller's luggage. The parties held a mutual understanding that the luggage contained Waller's private personal effects. Waller never gave Howard permission to open the luggage bag and Howard never did so. The luggage contained not only the firearms but also personal toiletries used by Waller, who showered in the apartment. On these facts, we conclude that Howard did not have *mutual use* of the luggage, nor did he have joint access and control *for most purposes*. Thus, he did not have common authority to grant permission to search Waller's luggage. *Cf. United States v. Fultz*, 146 F.3d 1102, 1106 (9th Cir. 1998) (holding that where defendant stored cardboard boxes in neighbor's garage, neighbor had no actual authority to consent to search of the boxes).

### iv.    Apparent Authority

Having determined that Howard did not possess actual authority to consent to the search of Waller's luggage, we must also examine whether the district court's denial of Waller's suppression motion can nonetheless be upheld on the ground that the officers justifiably relied on Howard's apparent authority. "When one person consents to a search of property owned by another, the consent is valid if 'the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises.'" *United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996) (quoting *Rodriguez*, 497 U.S. at 188). Whether the facts presented at the time of the search

would "warrant a man of reasonable caution" to believe the third party has common authority over the property depends upon all of the surrounding circumstances. *Rodriguez*, 497 U.S. at 188 (citation omitted). The government cannot establish that its agents reasonably relied upon a third party's apparent authority "if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry. If the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to 'mutual use' by the person giving consent, 'then warrantless entry is unlawful without further inquiry.'" *United States v. McCoy*, Nos. 97-6485, 97-6486, 97-6488, 1999 WL 357749, at *10 (6th Cir. May 12, 1999) (unpublished table decision) (Clay, Circuit Judge, concurring) (quoting *United States v. Whitfield*, 939 F.2d 1071, 1075 (D.C. Cir. 1991)). Where the circumstances presented would cause a person of reasonable caution to question whether the third party has mutual use of the property, "warrantless entry without further inquiry is unlawful[.]" *Rodriguez*, 497 U.S. at 188-89 (noting that "the surrounding circumstances could conceivably be such that a reasonable person would doubt [the apparent consent] and not act upon it without further inquiry.").

In *McCoy*, government agents were conducting drug transaction surveillance at a residence to which they responded after an informant's cover was broken. 1999 WL 357749 at *1. The agents successfully restrained the three occupants of the residence, including McCoy, outside the home, and one of the agents sought consent to search the residence from one of the other occupants, in whose name the home had been rented. *Id.* at *2. That occupant consented to the search and signed a written consent form. *Id.* During the search, the agent discovered and opened a locked briefcase, which was owned by McCoy. *Id.* On appeal, McCoy challenged the validity of the search, arguing that he never consented to the search of the briefcase. This court determined that the agent could not justify searching McCoy's briefcase on the sole consent of the third-party renter because at the time that the agent requested consent to search he knew that, in addition to the named renter, McCoy and another person could have had "a protected privacy interest" in the briefcase. *Id.* at *3. This court concluded that, when confronted with this ambiguity, the agent should have sought the other occupants' consent in determining the ownership of the bag. *Id.*

In addition to the Supreme Court's indication in *Rodriguez,* and this court's holding in *McCoy*, a number of other courts have also recognized an officer's duty to inquire in ambiguous situations. *See, e.g.*, *United States v. Kimoana*, 383 F.3d 1215, 1222 (10th Cir. 2004) ("[W]here an officer is presented with ambiguous facts related to authority, he or she has a duty to investigate further before relying on the consent"); *United States v. Rosario*, 962 F.2d 733, 738 (7th Cir. 1992) (language from *Rodriguez* "suggests that in the absence of sufficient facts, officers have a duty to seek further information in order to determine whether they may reasonably infer that the inviter has the necessary authority to consent to an entry or search of the premises[]"); *Whitfield*, 939 F.2d at 1075 (government's burden to prove consent "cannot be met if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry[]"); *United States v. Corral*, 339 F. Supp. 2d 781, 794 (W.D. Tex. 2004) ("[A]gents cannot rely on the apparent authority doctrine to justify a warrantless search based on third party consent when they lack a sufficient factual basis to conclude that the third party had the authority to consent."); *Kaspar v. City of Hobbes*, 90 F. Supp. 2d 1313, 1319 (D.N.M. 2000) ("[A]mbiguity regarding a person's ability to consent triggers a police officer's obligation to conduct further factual inquiry before relying on a grant of third-party consent.") (internal quotations omitted); *United States v. Chun Yen Chiu*, 857 F. Supp. 353, 361 (D.N.J. 1993) ("Where police officers are faced with an ambiguous situation, unless further inquiry is made which determines that the property about to be searched is subject to 'mutual use' by the person giving consent, it is unlawful to enter without a warrant.") (citation omitted); *see also United States v. Jaras*, 86 F.3d 383, 389 (5th Cir. 1996) (holding that officers unreasonably relied on a third party's consent to search the defendant's suitcase left in the trunk of third party's car); *United States v. Welch*, 4 F.3d 761, 765 (9th Cir. 1993) (holding that officers unreasonably relied on a third party's consent to search the defendant's purse left in the trunk of third party's car).

In applying these legal principles to the present case, we conclude that the circumstances made it unclear whether Waller's luggage bag was "subject to 'mutual use' by" Howard and therefore the officers' warrantless entry into that luggage without further inquiry was unlawful. The arresting police officers took Waller into custody in the parking lot of Howard's apartment complex. With Waller restrained in the parking lot, they proceeded to Howard's apartment. Upon arriving at the apartment, Officers Eby and Helmintoller encountered Howard and two other female occupants. According to Officer Eby, he first inquired of the occupants whether Waller had recently come from that apartment. They indicated he had. Given that his primary concern at the time was in locating Shatika Ball, Officer Eby also asked the female occupants whether either of them were Ball. Officer Eby then sought consent only from Howard to search the residence, presumably still in search of Ball. Howard gave the officers verbal and written consent to search his apartment. Once the officers determined Ball was not there, and with written consent in hand, the officers shifted the focus of their search to find any items Waller might have left there. During the search of the bedroom closet, Officer Helmintoller found Waller's zipped luggage, which he opened to find the firearms at issue.

In determining that the circumstances of this case created ambiguity regarding the validity of the consent to search Waller's luggage, we find persuasive authority in *United States v. Salinas-Cano*, 959 F.2d 861 (10th Cir. 1992). That case involved a defendant who left his closed suitcase at his girlfriend's apartment. *Id.* at 862. After the defendant's arrest, the police sought and acquired consent to search the suitcase only from the girlfriend. *Id.* In examining the girlfriend's consent to search the suitcase, the court noted several factors, including (1) the type of container, because certain container types "historically command a high degree of privacy"; (2) whether the owner took any precautions to manifest his subjective expectation of privacy; (3) whether the host of the premises initiated police involvement (e.g., officers invited to search an item during a response to a domestic violence report); and (4) whether the consenting party displayed a lack of interest in the item (e.g., disclaiming ownership). *Id.* at 864. The Tenth Circuit held the search of the suitcase unlawful because it was "a type of container long associated with privacy expectations," *id.* at 865, the defendant had testified to his subjective expectation of privacy and had never permitted his girlfriend to look inside the suitcase, *id.*, he had not abandoned the suitcase but "instead maintained a periodic presence in the apartment[,]" *id.*, and the agents had not questioned his girlfriend in a manner sufficient to determine whether she had mutual use of the defendant's suitcase, *id.* at 866.

Here too, Waller's luggage is the type of container that "historically command[s] a high degree of privacy." *Id.* at 864; *see* 4 Wayne R. LaFave, Search and Seizure § 8.5(d), at 231 (4th ed. 2004) ("[T]he articles which it would seem would most commonly be deserving of the 'high expectation of privacy' label in the host-guest context would be the overnight bag or suitcase or similar object brought to the premises by the guest"). "Common experience of life, clearly a factor in assessing the existence and the reasonableness of privacy expectations, surely teaches all of us that the law's 'enclosed spaces' [–] mankind's valises, suitcases, footlockers, strong boxes, etc. [–] are frequently the objects of his highest privacy expectations[.]" *United States v. Block*, 590 F.2d 535, 541 (4th Cir. 1978); *see also United States v. Basinski*, 226 F.3d 829, 834 (7th Cir. 2000) (stating that "it is less reasonable for a police officer to believe that a third party has full access to a defendant's purse or briefcase than, say, an open crate"). The expectation of privacy in one's luggage is not lessened by storing it on the premises of a third-party. Rather, "the expectations may well be at their most intense when such effects are deposited temporarily or kept semi-permanently . . . in places under the general control of another." *Block,* 590 F.2d at 541. Waller's transient state only enhances his expectation of privacy in his luggage. "Indeed, to the sojourner in our midst[,] all of us at one time or another[,] the suitcase or trunk may well constitute practically the sole repository of such expectations of privacy as are had." *Id.*

In this case, the officers arrested Waller on a bond violation in relation to a warrant that had been based upon a complaint by Cynthia Green, alleging aggravated assault involving firearms. The arresting officers knew that Waller had recently left the Storey residence and that he did not permanently reside in Howard's apartment. Prior to the officers conducting the search, Howard informed the officers that

Waller had stored personal items in the apartment. In addition to Howard, there were two other individuals present in the residence at the time of the search. On the basis of these facts, a reasonable officer would have found ambiguity in the ownership of the luggage bag and in Howard's common authority to consent to the search of it.

Although an officer could have reasonably believed that Howard exhibited some level of control over the luggage, common authority rests "on mutual use of the property by persons generally having joint access or control for most purposes." *Matlock*, 415 U.S. at 171, n.7. In the context of a visitor's travel bag entrusted to a third party host, the government must show both joint access or control *and* mutual use in order to establish common authority for a third party's consent. *Salinas-Cano*, 959 F.2d at 864. Here, as in *Salinas-Cano* and *Whitfield*, the officers did not ask any questions to determine whether Howard had "mutual use" of the luggage. The officers' failure to make further inquiry is especially pronounced in this case because Howard was in the next room when the police found the luggage, and Waller was being detained outside the apartment. It would not have been burdensome for the officers to have asked Howard whether the luggage belonged to him (or to either of the women who were present in the apartment) prior to opening the bag. *See McCoy*, 1999 WL 357749 at *3 ("Because both McCoy and Gayle Wells were detained in the front of the dwelling, it would not have been difficult or onerous for [Agent] Morgan to seek their consent as well upon determining the ownership of the bag.").

The facts in this case are clear: the police never expressed an interest in *Howard's* belongings in Howard's apartment. The very purpose of the police presence was to search for (presumably) illegal possessions of *Waller's*. Why would the police open the suitcase if they reasonably believed it belonged to Howard? The answer is that they would not have opened the bag. They opened the bag precisely because they believed it likely belonged to Waller. The police knew Waller was storing belongings at the Howard apartment. Most people do not keep a packed, closed suitcase in their own apartment. Deliberate ignorance of conclusive ownership of the suitcase does not excuse the warrantless search of the suitcase, especially when actual ownership could easily have been confirmed. We agree with the Tenth Circuit that "to hold that an officer may reasonably find authority to consent solely on the basis of the presence of a suitcase in the home of another would render meaningless the Fourth Amendment's protection of such suitcases." *Salinas-Cano*, 959 F.2d at 866.

Inasmuch as we conclude that the circumstances presented here were sufficiently ambiguous to place a reasonable officer on notice of his obligation to make further inquiry prior to conducting a search of the luggage, we hold that the officers' warrantless entry into Waller's luggage without further inquiry was unlawful under the Fourth Amendment. Accordingly, the district court erred in failing to suppress the firearms that were discovered in Waller's luggage. Having concluded that the district court erred in denying suppression, we need not address Waller's remaining challenges.

### III. CONCLUSION

For the foregoing reasons, we **REVERSE** Waller's conviction, **VACATE** his sentence, and **REMAND** this case to the district court for proceedings consistent with this opinion.