**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 18a0363n.06

**Nos. 17-1377/1465**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jul 24, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| JUSTIN JENKINS; QUINTIN HOWELL, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

**BEFORE: GIBBONS, BUSH, and LARSEN, Circuit Judges.**

**JULIA SMITH GIBBONS, Circuit Judge.**

Justin Jenkins and Quintin Howell appeal the denial of their motions to suppress evidence, which they claim was obtained through searches conducted in violation of the Fourth Amendment. Following denial of these pretrial motions, Jenkins and Howell entered conditional guilty pleas, reserving the right to appeal the district court's determinations of their motions. Because the district court correctly concluded that the evidence seized during these searches should not be suppressed, we affirm.

I.

This case involves an investigation by the Kalamazoo Valley Enforcement Team ("KVET") of a heroin-trafficking operation in and around Kalamazoo, Michigan. In October 2014, a confidential informant ("CI1") informed KVET that he had purchased heroin from a local group, led by an individual known as "Ghost." CI1 provided investigators with the number to a cell phone that he would call to arrange heroin purchases from the group (the "Ghost Phone"). He

described how this phone was rotated among the group and how "Ghost," often accompanied in the same vehicle by a man known as "Dreds," would deliver heroin after CI1 called to place an order. Based on prior arrest photos, CI1 identified "Dreds" as Maurice Streeter and "Ghost" as Quintin Howell. In connection with a prior arrest, Howell had listed his address as 3130 Dori Drive, Apartment 103, Oshtemo Township, Michigan ("Dori Drive").

A.      *Dori Drive*

KVET then staged five controlled-buys using CI1 as the purchaser. For each operation, CI1 would place a recorded call to the Ghost Phone, speak to a member of the distribution group— generally Howell—to order heroin, and then agree to meet at a designated location to make the buy. KVET officers would then observe as CI1 met up with members of the distribution group, handed over cash, and received heroin. After each buy, officers tested and confirmed the purchased substance, and CI1 had a debriefing interview with KVET officers.

After the first controlled buy, investigators obtained a GPS phone ping search warrant for the Ghost Phone. Using this warrant, they tracked the Ghost Phone's location and discovered that it was frequently in the area of Dori Drive during the day and overnight. During one of the controlled buys in November 2014, KVET officers observed CI1 make contact with a black Chrysler, which was registered to Howell's girlfriend, Lashonda Reynolds, at Dori Drive. CI1 informed officers that Streeter was driving and that Howell was the passenger and had sold him the heroin. In early December 2014, CI1 completed a fourth controlled buy, and immediately following this buy investigators observed Howell driving the black Chrysler registered to Dori Drive past the location where CI1 had just purchased heroin. On December 11, 2014, KVET officers conducting surveillance on Dori Drive observed Howell looking out of the apartment's

second-floor window. Howell then walked outside to meet up with the individual who had sold CI1 heroin during the fourth controlled buy in front of Dori Drive.

Less than 24 hours after the fifth controlled buy, on December 16, 2014, investigators filed a warrant application for 3130 Dori Drive Apartment 103, with the affidavit citing the above-listed evidence as well as the officer's training and experience with drug trafficking. The warrant was granted, and on December 18, 2014, KVET officers executed the search of Dori Drive and discovered, among other things, 0.65 grams of heroin, a scale with heroin residue, a police scanner, firearms, ammunition, $1,933 in cash, and numerous cell phones.

KVET continued its investigation of the distribution ring, and in December 2014, a confidential informant ("CI2")[1] told investigators of a second cell phone by which he had arranged purchases of heroin from "Ghost" (now identified as Howell). This number, however, was quickly phased out, and CI2 advised police that the primary phone used by the group to arrange heroin deals was now shared between two men known as "Mike" and "Giovanni" (the "Mike/Giovanni Phone"). Investigators later identified "Giovanni" as Henry Hall and "Mike" as Justin Jenkins. Then, between February and April of 2015, KVET staged six controlled buys in which CI2 used the Mike/Giovanni Phone to arrange heroin purchases. The method for these controlled buys was the same as in the 2014 investigation.

B. *Dragonfly, Edwin, and Candlewyck*

During this time, investigators also began surveilling three locations believed to be connected with the distribution ring—755 Dragonfly, Apartment 265, Oshtemo Township, Michigan ("Dragonfly"); 520 Edwin, Kalamazoo, Michigan ("Edwin"); and 300 Candlewyck

---

[1] The warrant applications do not specify that this was the same informant as CI1, but the district court noted that "[i]t appears that the CI for the 2015 investigation was the same CI for the Fall 2014 investigation." DE 227, Order, Page ID 1301 n.6.

Drive, Apartment 1203, Kalamazoo, Michigan ("Candlewyck"). On April 7, 2015, investigators applied for search warrants for these three residences, citing as support their earlier investigation of Howell, information developed from CI2, the six controlled purchases, and officers' surveillance, as well as the officers' knowledge of and experience with drug trafficking.

Specifically, as to Dragonfly, the affidavit submitted the following: Investigators observed Howell at Dragonfly and determined that he resided there. The registered tenant of Dragonfly was Reynolds—Howell's girlfriend and mother of his child. The affidavit listed that Reynolds had rented a gold Chevy Malibu and that on April 6, 2015, officers observed Howell exit Dragonfly and enter the Chevy Malibu rental and then drive to meet CI2 for a controlled buy—which was audio and video recorded. After this controlled buy, officers observed Howell return to Dragonfly and enter the apartment. Investigators submitted the warrant affidavit for Dragonfly the next day.

In support of the Candlewyck warrant, that warrant affidavit described how on February 25, 2015, CI2 made two controlled buys of heroin from Hall, which had been arranged by calling the Mike/Giovanni Phone. For the first buy, investigators observed Hall arrive at the designated place for the drug deal in a baby blue Toyota Yaris and make the sale to CI2. After the buy, officers then observed Hall park in the area of Candlewyck and use a key to enter the secured door of building 300.[2] Shortly thereafter, KVET officers watched Hall leave Candlewyck and drive to three separate business parking lots to meet up with individuals in cars. Hall left each parking lot without entering any of the businesses. The affiant stated that based on his experience, these brief interchanges were indicative of drug sales. Later that day, CI2 arranged a second controlled buy of heroin by calling the Mike/Giovanni Phone. Investigators then observed CI2 purchase heroin

---

[2] The affidavit indicates that apartment 1203 is located inside of building 300. A key, however, was required to enter building 300. The affidavit cited examples of Hall entering building 300 using a key, a suspect—likely Hall—entering apartment 1203, and a vehicle registered to apartment 1203 being observed in connection with the 2014 investigation of Howell.

from an individual in the same blue Yaris, who CI2 later confirmed was Hall. Hall, in the Yaris, then departed the buy site, picked up a passenger at a hotel, and returned to Candlewyck. On March 3, 2015, KVET investigators observed three men arrive at Candlewyck in the baby blue Toyota Yaris and enter the building. About an hour and a half later, the driver and one of the passengers, who was carrying a black duffel bag, exited the building and got into the Yaris. The Yaris then drove to Edwin, and the passenger got out of the vehicle with the duffle bag and entered that residence. After dropping off the passenger, officers observed the Yaris return to Candlewyck. The next day, a KVET investigator observed the driver of the Yaris key into Apartment 1203 at Candlewyck. On March 31, 2015, officers again observed Hall leave Candlewyck, this time driving a tan Chevy Trailblazer, to make two quick meetings with individuals in parking lots— apparent drug sales. Investigators then had CI2 make a recorded call to the Mike/Giovanni Phone to arrange a controlled buy that day. Investigators then observed CI2 make contact with the Trailblazer and purchase heroin from the driver, later confirmed by audio and video recordings to be Hall.

For the Edwin warrant, the affidavit also described the Howell investigation, the controlled buys using CI2, and KVET's surveillance of Hall and the Candlewyck apartment, including the March 3 trip between Candlewyck and Edwin. It also included details of surveillance from a February 19, 2015, controlled buy in which the suspect who had just sold heroin to the informant switched vehicles to a dark-colored Chevy Malibu registered to Karmease Langston at the Edwin address. The affidavit additionally provided that on April 1, 2015, investigators observed Hall leave Candlewyck and drive to Edwin, where he met up with Howell, driving the gold Malibu registered to Reynolds, and another individual in a black Yukon. Investigators followed the men and observed Hall receive a black plastic bag from the driver of the Yukon at a nearby parking lot.

The Yukon driver and Hall later returned to Candlewyck. The next day, investigators observed Hall again drive his Trailblazer from Candlewyck to Edwin. Hall idled in the driveway, and an individual emerged from the residence and met with Hall briefly inside the Trailblazer before going back inside Edwin. Then, on April 6, 2015, CI2 arranged a controlled buy from "Mike" (now identified as Jenkins). Just prior to the controlled-buy operation, investigators saw the Edwin-registered Malibu in the driveway of Edwin. During the controlled buy—which was captured on audio and video recording—"Mike" drove this Malibu to meet CI2 and sold him heroin and cocaine. Twenty minutes after the completion of the controlled buy, investigators again observed the Malibu Jenkins had just driven to the drug deal in the driveway of Edwin.[3]

Investigators applied for the Dragonfly, Candlewyck, and Edwin warrants on April 7, 2015—less than 24 hours after the final controlled buy—and executed the warrants on April 8. During the search of Dragonfly, investigators found 1.92 grams of heroin, multiple cell phones, and over $2,000 in cash. During the search of Candlewyck, investigators found 13.89 grams of cocaine base (crack), multiple scales with heroin residue, six cell phones, and over $9,000 in cash. And at Edwin, investigators discovered a little over 5 grams of cocaine and a digital scale.

C.    *Suitcase and Rental Car*

Based on this information and evidence, a grand jury returned an indictment for Howell, Hall, Jenkins, and other members of the distribution ring. Howell was arrested on August 11, 2015. That same day, investigators went to the residence of Hall's girlfriend, Kailah Lee, in Benton Harbor, Michigan, in an attempt to find and arrest Hall. Lee told investigators that Hall had been there earlier that morning with another guy she knew as "P," but that she had asked Hall to leave and not to let "P" in the house. Lee gave investigators permission to enter the apartment

---

[3] The warrant affidavit for Candlewyck also described the April 6 controlled buy and the April 1 surveillance.

and search for Hall, whom they did not find. Lee then gave investigators permission to search the house generally. During this search, investigators observed a suitcase on the living room floor—inside of the suitcase investigators discovered 118 grams of heroin and the Michigan State ID card of Jenkins, whom Lee identified as "P." Apparently Hall and Jenkins had been inside the apartment but fled when they saw the police approaching.

On a table next to the suitcase were the keys to a Ford Fusion rental car, which was parked on the street in front of Lee's apartment. Police towed the Fusion to the station and obtained a search warrant for the car. Prior to obtaining the warrant, police determined that the Fusion was rented to Karmease Langston, Jenkins's girlfriend, at the Edwin address. Inside the Fusion, police found four stolen, loaded guns, a plate with heroin residue, and a scale. Jenkins was later located and arrested in Missouri on August 20, 2015.

Howell's and Jenkins's trials proceeded jointly. The men filed multiple pretrial motions to suppress evidence they claim was obtained in violation of the Fourth Amendment: Howell filed motions to suppress the evidence from the Dragonfly and Dori Drive searches, and Jenkins filed motions to suppress the evidence from the Dragonfly, Candlewyck, and Edwin searches, as well as the evidence seized from the suitcase in Lee's apartment and from the Ford Fusion. The district court denied all of these motions.

Following the district court's denial of their motions, Jenkins pled guilty to possession of 100 grams or more of heroin with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(i), and possession of firearms in furtherance of the drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). Howell pled guilty to conspiracy to possess 100 grams or more of heroin with intent to distribute, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(B)(i), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C.

§ 924(c)(1)(A)(i). These pleas were conditional, reserving the defendants' rights to seek review of the district court's denial of their pretrial motions and withdraw their guilty pleas should the denials be reversed on appeal. The men then filed this consolidated appeal.

## II.

When reviewing denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusion as to the existence of probable cause *de novo*. *United States v. Williams*, 544 F.3d 683, 685 (6th Cir. 2008). In doing so, we "view the evidence in the light most favorable to the government" and "give great deference to an issuing judge's finding of probable cause in a search warrant application." *Id.*; *see also United States v. Laughton*, 409 F.3d 744, 747 (6th Cir. 2005) ("[T]he duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." (alteration in original) (quoting *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983))). We review a district court's determination that the good-faith exception to suppression applies *de novo*. *See United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005).

## A.

Jenkins and Howell first claim that the district court erred in denying their motions to suppress evidence seized during KVET's searches of the four residences in this case. Howell challenges the district court's denial of his motion to suppress the evidence seized from Dori Drive, Jenkins challenges the district court's denial of his motion to suppress the evidence seized from Edwin and Candlewyck, and both men challenge the district court's denial of their motions to suppress the evidence seized from Dragonfly. The district court concluded that the Dori Drive and Dragonfly search warrants were supported by probable cause and concluded, without determining whether probable cause existed, that the good-faith exception to suppression applied to the

warrants issued for Edwin and Candlewyck. We agree and therefore conclude that the district court correctly denied the defendants' motions to suppress these warrants.

1.

The Fourth Amendment requires that there be probable cause for a search warrant to issue. U.S. Const. amend. IV; *see Williams*, 544 F.3d at 686. "An issuing judge may find probable cause to issue a search warrant when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Williams*, 544 F.3d at 686 (quoting *Laughton*, 409 F.3d at 747); *see also Gates*, 462 U.S. at 238. This requires that the affidavit or warrant request "state a nexus between the place to be searched and the evidence sought." *Williams*, 544 F.3d at 686 (quoting *United States v. Bethal*, 245 F. App'x 460, 464 (6th Cir. 2007)); *see also United States v. Van Shutters*, 163 F.3d 331, 337 (6th Cir. 1998) (requiring a "nexus between the premises and the criminal activity")). This belief that the items sought will be found at the location to be searched may "be supported by less than prima facie proof but [requires] more than mere suspicion." *Williams*, 544 F.3d at 686 (quoting *Bethal*, 245 F. App'x at 464); *see also United States v. Johnson*, 351 F.3d 254, 258 (6th Cir. 2003) ("Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990))).

Although we have stated that "an issuing judge may infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking," *Williams*, 544 F.3d at 687, our cases have clarified that a "defendant's status as a drug dealer, standing alone," will not "give[] rise to a fair probability that drugs will be found in his home," *Frazier*, 423 F.3d at 533. Therefore, to meet the probable cause standard, an affidavit must include some facts connecting the residence to drug-dealing activity beyond just the defendant's status as a drug dealer. *United States v. Brown*,

828 F.3d 375, 382–84 (6th Cir. 2016) ("[O]ur cases teach, as a general matter, that if the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity, or the evidence of this connection is unreliable, it cannot be inferred that drugs will be found in the defendant's home—even if the defendant is a known drug dealer."); *cf. United States v. Raglin*, 663 F. App'x 409, 412 (6th Cir. 2016), *cert. denied*, 138 S. Ct. 354 (2017) (mem.). Here, the warrant affidavits for Dori Drive and Dragonfly supplied such facts.

Howell argues that the government did not show the required nexus between criminal activity and the Dori Drive residence to establish a fair probability that contraband would be found there, as the affidavit established only that he lived at Dori Drive and did not draw any direct connection between it and drug-dealing activity. This is not the case. The affidavit did establish that Howell lived at Dori Drive, based on his own report related to a prior arrest and investigators' surveillance during 2014, and that Howell was a known drug dealer, based on CI1's statements, investigators' surveillance, and several controlled buys in which CI1 bought heroin directly from Howell. But more than this, the affidavit presented reliable evidence directly linking Dori Drive to the ongoing drug-dealing operation.

As noted by the district court, the affidavit linked a key instrumentality of the crime—the Ghost Phone—to the Dori Drive address. The affidavit stated that the GPS data from the Ghost Phone showed Dori Drive as a "consistent address[] frequented during the day and overnight" by users of the phone. DE 162-1, Dori Aff. & Warrant, Page ID 837. The Ghost Phone was used to arrange all five 2014 controlled buys, including the final buy that occurred less than 24 hours before the warrant application for Dori Drive was filed. Howell points to *United States v. Helton* to argue that the GPS evidence did not establish a nexus, but his reliance is misplaced. In *Helton*, we concluded that an allegation that a defendant had called a known drug dealer across several

10

months, averaging three phone calls a month, did not provide probable cause to search the *defendant's* home. 314 F.3d 812, 821 (6th Cir. 2003). Here, instead, investigators identified and tracked a phone consistently used to arrange drug sales by the *dealers* to Dori Drive, making the inference that drugs would be stored in the home much stronger.

In addition, the Dori Drive warrant affidavit linked a car repeatedly used in the drug-dealing operation to Dori Drive. During the third controlled buy, Howell sold CI1 heroin from a black Chrysler registered to the Dori Drive address, and Howell was spotted driving this Chrysler immediately after the fourth controlled buy. The affidavit also cited investigators' surveillance of Dori Drive—noting that Howell was observed meeting with the individual who had sold CI1 heroin during the fourth controlled buy in front of Dori Drive just a few days prior to the warrant application. Taken together with Howell's status as a known drug dealer, this evidence satisfies the probable cause standard. *United States v. Gunter*, 266 F. App'x 415, 419 (6th Cir. 2008) ("[A] nexus exists between a known drug dealer's criminal activity and the dealer's residence when some reliable evidence exists connecting the criminal activity with the residence."); *see also Brown*, 828 F.3d at 382.

Howell and Jenkins[4] also challenge the Dragonfly search on nexus grounds, claiming an insufficient connection between drug-dealing activity and that residence. The Dragonfly affidavit, however, presented particularly strong evidence establishing probable cause. That affidavit outlined Howell's involvement in the ongoing heroin trafficking operation, recounted facts from

---

[4] As noted by the district court, Jenkins has not presented evidence that he had a privacy interest in, and therefore standing to contest the search of, Dragonfly. *See Rakas v. Illinois*, 439 U.S. 128, 134 (1978). However, "[s]tanding to challenge a search or seizure is a matter of substantive Fourth Amendment law rather than of Article III jurisdiction . . . meaning that the government can waive the standing defense by not asserting it." *United States v. Huggins*, 299 F.3d 1039, 1050 n.15 (9th Cir. 2002), *quoted in United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009); *see Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018) ("Because Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question."). The government did not raise the issue of Jenkins's standing to contest the residence searches in the district court and has not raised it on appeal; we therefore do not address it here.

KVET's 2014 investigation and controlled-buy operations, and provided evidence that Howell resided at Dragonfly, where his girlfriend was the registered tenant. It also linked specific drug-dealing activity to Dragonfly: it describes how officers observed Howell exit Dragonfly, drive the gold Malibu from Dragonfly to the controlled buy on April 6, 2015, sell heroin to CI2, drive back to Dragonfly, and then reenter Dragonfly. Investigators applied for the Dragonfly warrant less than 24 hours after this sale.

Howell and Jenkins point to the fact that the affidavit does not allege that anyone ever purchased drugs directly from the Dragonfly residence or observed drugs inside of that residence to argue there was not probable cause here. But such a level of involvement is not required for a finding of probable cause. *See Gunter*, 266 F. App'x at 419 (officer observing known drug dealer "visit[] his residence right before he traveled to the site of a drug sale" provided "reliable evidence" establishing nexus). Drug dealers cannot immunize themselves from search of a residence used to store their supply simply by ensuring that all drug deals take place in parking lots. Indeed, in hypothesizing what *would* constitute a sufficient nexus between a residence and drug activity, we postulated in *Brown* that "[a] more direct connection . . . , such as surveillance indicating that [a defendant] had used the car [registered to his home] to transport heroin from his home to [a co-conspirator's] on the day in question" would have be sufficient to meet the nexus requirement. 828 F.3d at 383. Here, the affidavit stated that investigators observed Howell leave Dragonfly in a car registered to Reynolds—the registered tenant of Dragonfly—sell drugs, and then immediately return to Dragonfly. Taken together with the inference "that drug traffickers use their homes to store drugs and otherwise further their drug trafficking," *Williams*, 544 F.3d at 687, and the additional specific facts articulated in the affidavit, there was probable cause to support issuance of the Dragonfly warrant.

2.

Jenkins next argues that the district court erred in denying his motions to suppress the evidence seized during the Candlewyck and Edwin searches under application of the good-faith exception to suppression. We conclude that the good-faith exception applies.

"When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004) (en banc) (quoting *Illinois v. Krull*, 480 U.S. 340, 347 (1987)). There is, however, "an exception to the exclusionary rule where 'the officer conducting the search acted in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate that subsequently is determined to be invalid.'" *United States v. Watson*, 498 F.3d 429, 431 (6th Cir. 2007) (quoting *Massachusetts v. Sheppard*, 468 U.S. 981, 987–88 (1984)); *see also United States v. Leon*, 468 U.S. 897, 922–23 (1984). The good-faith exception, however, will not apply where "the affidavit is 'so lacking in [indicia of] probable cause as to render official belief in its existence entirely unreasonable'" or "where the officer's reliance on the warrant was neither in good faith nor objectively reasonable."[5] *Frazier*, 423 F.3d at 533 (quoting *Leon*, 468 U.S. at 923.)

Jenkins contends that the good-faith exception should not apply to the Candlewyck and Edwin searches, as the warrants were supported only by "bare bones" affidavits, making law enforcement's reliance on the warrants unreasonable. He similarly argues that the affidavits clearly lacked indicia of probable cause because they failed to establish the required nexus between criminal wrongdoing and the place to be searched. Jenkins's arguments that the affidavits were

---

[5] The good-faith exception will also not apply when "the supporting affidavit contained knowing or reckless falsity" or "the issuing magistrate wholly abandoned his or her judicial role," neither of which is alleged here. *Frazier*, 423 F.3d at 533.

"bare bones" and that they "clearly lacked indicia of probable cause" both point to the purported lack of nexus between the residences and the drug-dealing activity, making the analysis for each claim essentially the same and equally uncompelling.

In determining whether an affidavit "is so bare bones as to preclude application of the good-faith exception," we look to whether the affidavit includes "particularized facts that indicate veracity, reliability, and basis of knowledge and that go beyond bare conclusions and suppositions." *United States v. Rose*, 714 F.3d 362, 367 (6th Cir. 2013); *see also United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017). This determination, however, "is a less demanding inquiry than the one involved in determining whether an affidavit provides a substantial basis for the magistrate's conclusion of probable cause." *Rose*, 714 F.3d at 367; *see also Carpenter*, 360 F.3d at 595–96. Like with probable cause, the affidavit "must draw some plausible connection" between the alleged drug-dealing activity and the residence to meet the good-faith standard. *Brown*, 828 F.3d at 385–86. But we have found that the good-faith exception will apply when "the affidavit contained a minimally sufficient nexus between the illegal activity and the place to be searched . . . , even if the information provided was not enough to establish probable cause." *Carpenter*, 360 F.3d at 596; *see also Frazier*, 423 F.3d at 537; *Van Shutters*, 163 F.3d at 338.

The warrant affidavits for Candlewyck and Edwin certainly articulate this "minimally sufficient nexus"—far from being "totally lacking in facts," both affidavits included details of drug-dealing activity related to each residence. *Carpenter*, 360 F.3d at 596. As outlined, among other factual allegations, the Candlewyck affidavit identified Hall as a member of the drug-distribution organization. It detailed how Hall sold heroin to CI2 in two controlled buys while driving the Toyota Yaris and how Hall drove this Yaris to Candlewyck and entered the secured

building containing apartment 1203 after both sales. The affidavit also stated that investigators observed Hall leave Candlewyck in the Yaris and drive to several parking lots where he met up with individuals in cars in a manner consistent with drug sales. And during another controlled buy a week before the Candlewyck warrant was issued, CI2 again bought heroin from Hall, who was on that occasion driving a Trailblazer that officers had observed him in when he departed Candlewyck earlier that day. Further, although the district court found that "neither affidavit firmly shows that a conspirator resided at [Candlewyck or Edwin]," Hall's repeated use of a key to gain entry to Candlewyck, and investigators' repeated observations of Hall at Candlewyck, strongly link Hall to that residence, providing additional support for a nexus between Candlewyck and drug-dealing activity. DE 227, Order, Page ID 1322; *see Williams*, 544 F.3d at 687.

Further, both the Candlewyck and Edwin affidavits describe how on April 1, 2015, investigators observed Hall drive to Edwin from Candlewyck to meet up with Howell and another individual in a black Yukon and then, the men reconvened at a parking lot, where Hall received a small black plastic bag from the Yukon driver. The Edwin warrant affidavit also included information about the distribution-ring players, the controlled buys, and surveillance of Edwin, drawing connections between that residence and drug-dealing activity. Although that affidavit did not specifically allege that Jenkins lived at Edwin, it did state that one of the subjects of the conspiracy "known as 'Mike'" (now identified as Jenkins), "utilizes 520 Edwin," and included repeated observations of "Mike" at Edwin. DE 170-1, Edwin Aff. & Warrant, Page ID 917. And, making the nexus to Edwin particularly strong, the affidavit described the April 6, 2015, controlled buy from "Mike," in which Jenkins drove the Edwin-registered Malibu, which had been surveilled at Edwin "just prior to the controlled-buy operation," to the drug deal. *Id.* at 922. The Malibu was

then "observed back in the driveway of 520 Edwin" 20 minutes after this sale. *Id.* The warrant affidavit and application were submitted the next day, on April 7, 2015.

Jenkins contends that his case is similar to *Laughton*, where we found the good-faith exception inapplicable, but he is incorrect. The warrant affidavit in question in *Laughton* provided only that an informant had purchased controlled substances and had observed controlled substances at the defendant's residence, but it did "not even say explicitly that the confidential informant had purchased the narcotics from the suspect" and did "not indicate where that residence was or when these observations were made." *Laughton*, 409 F.3d at 751; *see also Rose*, 714 F.3d at 368 (noting that in *Laughton* there was "no 'modicum of evidence, however slight, to connect the criminal activity described in the affidavit to the place to be searched'" (quoting *Laughton*, 409 F.3d at 749)). Therefore, the warrant affidavit in *Laughton* provided a much more tenuous connection between the residence and the criminal activity than the Candlewyck and Edwin affidavits here.

Indeed, we have found the good-faith exception applicable to warrants supplying a much thinner connection between criminal activity and a place to be searched than the Candlewyck and Edwin affidavits. For example, in *Carpenter*, we held that the good-faith exception applied to a warrant where the affidavit stated only that aerial surveillance showed a "road connecting" a marijuana field to a home that was "near." 360 F.3d at 593. We held that this provided a "minimally sufficient nexus between the illegal activity and the place to be searched," even though it contained no details about the individuals who used the path and no allegation of illegal activity directly connected to the home. *Id.* at 596. The information provided in the Candlewyck and Edwin affidavits provides a stronger nexus than in *Carpenter*—each of these affidavits connected the residences to ongoing drug-dealing activity and identified suspects in the distribution group.

*See United States v. Washington*, 380 F.3d 236, 243 (6th Cir. 2004) (holding that an affidavit "clearly satisf[ied] the 'so lacking' standard necessary for *Leon*'s good-faith exception" in a similar situation where police observed a defendant complete several drug deals in a car registered to the residence for which the warrant was issued and that had been observed at the residence immediately prior to a drug sale). These warrants therefore meet the good-faith exception, and the district court correctly denied Jenkins's pretrial motion to suppress the evidence seized from Candlewyck and Edwin.

B.

Jenkins next challenges the district court's denial of his motion to suppress the heroin that police found in the suitcase that he left behind in Lee's apartment. After holding a suppression hearing, the district court concluded that Jenkins did not have standing to contest this search, as he had no legitimate expectation of privacy in the suitcase. We agree and therefore conclude that the district court correctly denied Jenkins's motion to suppress this evidence.

To have standing to contest a search, a defendant must show that "he had a legitimate expectation of privacy in the area searched or items seized." *United States v. Mathis*, 738 F.3d 719, 729 (6th Cir. 2013); *see Rakas v. Illinois*, 439 U.S. 128, 134 (1978). This legitimate expectation of privacy exists only if "the defendant exhibited an actual subjective expectation of privacy" and "the defendant's subjective expectation of privacy is 'one that society is prepared to recognize as reasonable.'" *United States v. Gillis*, 358 F.3d 386, 391 (6th Cir. 2004) (quoting *United States v. Knox*, 839 F.2d 285, 293 (6th Cir. 1988)); *see also Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).

The district court concluded that Jenkins did not demonstrate this required first prong, a subjective expectation of privacy in the suitcase, and, moreover, that any such expectation would

not have been objectively reasonable because "Jenkins left his unlocked suitcase in the living room of a person he did not know, who did not want him in her apartment, and who, especially, wanted no part of transporting heroin." DE 233, Findings & Concl., Page ID 1352–53. Jenkins, however, contends that this court's holding in *United States v Waller*, 426 F.3d 838 (6th Cir. 2005), supports that he maintained a legitimate expectation of privacy in a suitcase left behind at another person's residence. But in *Waller*, the defendant had asked a friend if he could store some personal belongings in the friend's apartment, to which the friend agreed. 426 F.3d at 842. After "[c]onsidering all of the relevant circumstances," including that "Waller left the bag zipped, closed, and stored in the bedroom closet of the apartment"; that the apartment's occupants "did not open his luggage because they believed it contained his personal effects"; and that Waller had "shown by his conduct that he sought to preserve the contents of his luggage bag as private," we concluded that Waller had demonstrated a subjective expectation of privacy in the bag and that this expectation was reasonable. *Id.* at 844.

Jenkins's situation is inapposite to Waller's. Considering all of the relevant circumstances, Jenkins demonstrated no subjective expectation of privacy in the suitcase because "by his conduct," he did not seek "to preserve [it] as private." *Mathis*, 738 F.3d at 729 (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)); *see Gillis*, 358 F.3d at 391. Jenkins was aware that Lee had not agreed to store or safekeep his suitcase for him—he had never even met Lee before. Lee had not invited Jenkins inside her apartment and had specifically instructed Hall not to let "P" inside. And Jenkins's treatment of the suitcase showed no identifiable precautions—it was not locked, and he left it lying in the main living area of Lee's apartment. *See Gillis*, 358 F.3d at 391–92 (no reasonable expectation of privacy when a car that was treated like a "storage shed" was unlocked,

the windshield and several side windows were missing, and the defendant had taken no reasonable precautions to keep the storage private).

We have noted that "[k]ey to [showing a subjective expectation of privacy] is that the defendant showed, not merely by his statements during litigation, but by his conduct, that he sought to preserve something as private." *Mathis*, 738 F.3d at 730. Jenkins cannot make this showing here. And even if he could, society would not be prepared to recognize as reasonable an uninvited guest's expectation of privacy in unlocked luggage left behind in the middle of a stranger's home. *See Gillis*, 358 F.3d at 391. Indeed, it is hard to imagine that upon discovering such a suitcase, the apartment's occupant *would not* examine its contents. *Cf. Waller*, 426 F.3d at 844 (factor showing defendant's subjective expectation of privacy was that the apartment's occupants "did not open his luggage because they believed it contained his personal effects"). The district court therefore correctly concluded that Jenkins has not shown a legitimate expectation of privacy in the suitcase and does not have standing to challenge this search.

C.

Jenkins next challenges the district court's denial of his motion to suppress the evidence obtained from the search of the Ford Fusion. After holding a suppression hearing, the district court concluded that Jenkins did not have standing to contest the search because "Jenkins presented no evidence to establish his standing with regard to the Fusion" and "the only evidence in the record shows that Kar[m]ease Langston rented the Fusion."[6] DE 233, Findings & Concl., Page ID 1356.

A defendant has the "burden of establishing his standing to assert a Fourth Amendment violation." *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001). Here, Jenkins presented no evidence supporting any reasonable expectation of privacy in the Fusion—he did not testify at the

---

[6] The district court mistakenly referred to Karmease Langston as Karnease in its opinion denying the motions to suppress the evidence found in the suitcase and rental car.

suppression hearing, and he presented no record evidence indicating that he had the renter's permission to use the Fusion.[7] Jenkins's failure to present any evidence indicating an expectation of privacy in the Fusion means that he has not met his baseline burden to show standing to contest the search.[8] *See United States v. Pino*, 855 F.2d 357, 360–61 (6th Cir. 1988), *as amended*, 866 F.2d 147 (6th Cir. 1989). The district court therefore correctly denied this suppression motion.[9]

## III.

We affirm the district court's denial of the motions to suppress.

---

[7] At oral argument, Jenkins's counsel "concede[d] that no evidence was presented at the hearing regarding [Jenkins's] particular standing" for the search of the Fusion. 17-1377 Oral Arg. Rec. at 27:56–28:07.

[8] The Supreme Court's recent decision in *Byrd v. United States*, which held that "as a general rule, someone in otherwise lawful possession and control of a rental car has a reasonable expectation of privacy in it even if the rental agreement does not list him or her as an authorized driver," does not affect this conclusion. *Byrd*, 138 S. Ct. at 1524. The defendant in *Byrd* testified at the suppression hearing that his girlfriend, the registered renter of the car, had given him permission to drive the rental car and that he had exclusive control over the vehicle from the time she gave him the keys. Petition for Writ of Cert., *Byrd v. United States* (No. 16-1371), at 7–8. Jenkins presented no such evidence that he was in lawful possession and control of the rental car.

[9] The district court further held that "[e]ven if Jenkins had standing, his motion fails on the merits." DE 233, Findings & Concl., Page ID 1357–58. Because we hold Jenkins lacks standing, we do not address this alternative holding.